COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                                 NO.
2-09-179-CV

 

 

CITY OF CARROLLTON                                                                    APPELLANT

 

                                                             V.

 

HEB PARKWAY SOUTH, LTD. AND                                                   APPELLEES

HEB/MEDICAL PARKWAY, LTD.

 

                                                       ------------

 

                         FROM
PROBATE COURT OF DENTON COUNTY

 

                                                       ------------

 

                                                      OPINION

 

                                                       ------------








This
appeal arises from the trial court=s denial
of the plea to the jurisdiction filed by the City of Carrollton (Athe City@) on
takings claims brought by HEB Parkway South, Ltd. and HEB/Medical Parkway, Ltd.
(collectively, AHEB@).  In two issues, the City argues that the trial
court erred by denying its plea to the jurisdiction on HEB=s
regulatory takings claims and on HEB=s
physical takings claim.  Because we hold
that HEB=s
regulatory takings claims are unripe and that HEB did not raise a physical
takings claim, we reverse the trial court=s order
and render judgment dismissing HEB=s takings
claims.

I.  Facts
and Procedural History

From 1989
to 1992, the City of Carrollton made improvements to Hebron Parkway (Athe
parkway@), a
street in the City.  During construction,
the City realigned a portion of Dudley Branch Creek, one of four major drainageways crossing the City.  As early as 1992, erosion began occurring in
the portion of Dudley Branch where construction had been done.  In 1993, the City received approval to sell
$510,000 in bonds to fund erosion control measures in Dudley Branch.  The City did not, however, fix the problem in
Dudley Branch at that time; the City contended that it did not construct
erosion control measures because the property owner would not give the City the
necessary easement.

HEB was
formed in 1999 to develop property owned by Maurice Moore.  MEMCO Management
Group, LLC, manages assets of the Moore family, including HEB.  HEB owns a140.304-acre
tract of land and a 27.59-acre tract of land south of the parkway (Athe
property@).  Dudley Branch runs through that property.








In 2000,
the City amended its stormwater and flood protection
ordinance.  The ordinance requires
property developers of channel sections to Aconsider
and account for channel stabilization in their design[,]
. . . whether they are left in their natural condition or are modified in any
manner.@  If the developer owns all or a portion of a
channel section or floodplain area affected by the ordinance, the developer is
required to improve the drainage channel or portion of the channel on the
proposed development site so as to reduce water velocity in that channel
section to 6.0 feet per second or below. 
The ordinance also imposes other requirements, depending on whether the
property incorporates all or only a portion of the channel section.  The city manager has the discretion Ato
require the implementation of the portion of these requirements as deemed
necessary.@

The
ordinance further states that A[a]ny person aggrieved by a decision
of the City Manager may appeal to the Planning and Zoning Commission [AP&Z@] for a variance.  The decision of [P&Z]
shall be final.@ 
The ordinance next reiterates that A[P&Z] . . . shall hear and decide requests for variances
from the requirements of [the stormwater] ordinance.@

In
November 2000, HEB submitted a preliminary development plat for a single family
home development on its property.  City
staff recommended approval of the plat, subject to staff stipulations,
including a stipulation that A[t]he
Homeowners Association shall be required to enter into a perpetual maintenance
agreement with the City for the . . . floodplain.@  At HEB=s
request, P&Z approved removing this language from
the Astipulations@ section
of the staff report and adding to the Ainformational
comments@ section
a comment that A[t]his development must comply
with the provisions of [the stormwater ordinance].@








Concerned
that it would have to pay for improvements to Dudley Branch that HEB believed
were the City=s responsibility, HEB halted
development proceedings while it met with City staff about the stormwater ordinance=s
application.  In a January 2001
agreement, the City agreed to study the ongoing flood plain issues to
facilitate the development of the property.

Throughout
2001, HEB representatives met with City staff about the application of the stormwater ordinance to the proposed development.  At a work session in 2001, the city council
considered options for amending the ordinance. 
In September 2001, HEB expressed its support for the amendment in a
letter to the mayor.  The mayor responded
by letter stating that amending the ordinance was not warranted and would not
happen at that time.  The director of
public works also indicated in a letter that the ordinance would not be
amended.  After receiving the mayor=s letter,
HEB requested another meeting, but the City=s
attorney telephoned HEB=s attorney and advised him that
the City would not participate in additional meetings.








In March
2002, HEB and the City entered into a development agreement under which HEB
agreed to construct the erosion control improvements to Dudley Branch.  Under the plan, the City agreed to pay
$510,000 (the amount approved for bonds in 1993), and HEB agreed to pay the
rest of the cost.  In January 2003, HEB
submitted an engineered plan for erosion control on Dudley Branch, and the City
approved the plan.  HEB completed the
improvements and then brought suit against the City for breach of contract and
for inverse condemnation under the federal and state constitutions.  The City filed a plea to the jurisdiction on
all of HEB=s claims except damages for
breach of contract.  The trial court
denied the motion, and the City now appeals that denial with respect to HEB=s inverse
condemnation claims.

II.  Regulatory Takings Claims

In its
first issue, the City argues that the trial court did not have subject-matter
jurisdiction over HEB=s federal and state inverse
condemnation claims alleging an exaction because these claims are permanently
unripe.  Specifically, the City argues
that these claims are unripe because the evidence conclusively established that
HEB never sought a final decision regarding the application of the City=s
regulations to HEB=s property.  Because the stormwater
ordinance at issue assigned P&Z the authority to
grant a variance, and because the record does not show that HEB sought a variance
or that HEB=s seeking such a variance would
be futile, we agree.








Standard of Review

Ripeness
is an element of subject matter jurisdiction.[1]  Whether a trial court has subject matter
jurisdiction is a question of law that we review de novo.[2]  In determining whether a trial court has
subject matter jurisdiction, we construe the pleadings liberally and accept as
true the factual allegations in the pleadings.[3]  If a plea to the jurisdiction challenges the
existence of jurisdictional facts, we consider relevant evidence submitted by
the parties when necessary to resolve the jurisdictional issues raised.[4]  We take as true all evidence favorable to the
nonmovant, indulging every reasonable inference and
resolving any doubts in the nonmovant=s favor.[5]








The
governmental unit asserting that the trial court lacks jurisdiction is required
to meet the summary judgment standard of proof for its assertion.[6]  As with a summary judgment motion, once the
government meets that burden, the burden shifts to the plaintiff to show that
there is a disputed material fact on the jurisdictional issue.[7]  If the evidence raises a fact question about
jurisdiction, the trial court must deny the plea to the jurisdiction.[8]  But if the evidence fails to raise a fact
question on jurisdiction, as with a motion for summary judgment, the trial
court rules on the plea to the jurisdiction as a matter of law.[9]  

Regulatory Takings

When a
landowner=s property has been taken or
damaged for public use without compensation, the landowner may bring an inverse
condemnation proceeding.[10]  The proceeding is Ainverse@ because the property owner
brings the suit, as compared to a condemnation proceeding brought by a
governmental entity to appropriate private property for a public purpose.[11]








Takings
may be physical (that is, @a direct
government appropriation or physical invasion of private property@)[12]
or regulatory (that is, based on a government regulation).[13]  A regulatory takings claim may be based on a
number of different theories.  One basis
for a regulatory takings claim occurs when a government Arequires
an owner to suffer a permanent physical invasion of her propertyChowever
minor.@[14]  For example, a law that requires a landlord
to permit a cable television company to install its facilities upon the
landlord=s
property constitutes a compensable taking.[15]  Under both the federal and Texas
constitutions, this type of regulation constitutes a per se taking for which
the landowner must be compensated.[16]  Another category of per se taking under both
the federal and Texas constitutions, sometimes referred to as a ALucas-type
>total
regulatory taking,=@ occurs
when a government regulation deprives a landowner of all economically
beneficial use of the owner=s
property.[17]








A
regulation will also constitute a taking when it does not deprive a landowner
of all of the property=s
economically beneficial use, but it does unreasonably interfere with the landowner=s right
to use and enjoy his property.[18]  This type of claim is sometimes called a APenn
Central@ takings
claim, and it will generally arise when a government has denied a landowner
approval to develop his property.[19]









The
United States Supreme Court has recognized one other theory on which a
regulatory takings claim may be based, resulting not from an outright denial of
approval for development but from the government=s
conditional approval.[20]  A takings claim may arise if a government
conditions its approval for development on the landowner providing or doing
somethingCthat is, on an exaction.  The Court has found that a land use exaction
constituted a taking in two cases, both of which Ainvolved
dedications of property so onerous that, outside the exactions context, they
would be deemed per se physical takings.@[21]  

The
Supreme Court of Texas has addressed an exaction as a taking under the Texas
constitution.[22]  In Stafford, because neither party
argued that the analysis would be different under the federal and Texas
constitutions, the court assumed that if the government action at issue
constituted a compensable taking under the federal constitution, it also
constituted a compensable taking under the Texas constitution.[23]  Likewise in the case before this court,
neither party argues that the federal standard for determining whether an
exaction constitutes a compensable taking does not apply to claims under the
Texas constitution.








The
Supreme Court of Texas has expanded on United States Supreme Court
jurisprudence to address the issue of whether an exaction-as-a-taking claim may
be based on something other than a requirement that a landowner dedicate real
property to public use.[24]  That court held in Stafford that a
takings claim may also be based on a requirement that the landowner spend
private funds on property that already belongs to the public.[25]  In that case, the Town of Flower Mound,
Texas, (Athe Town@)
required the developer landowner to rebuild a road abutting the residential
subdivision proposed by the landowner.[26]  This improvement was required by the Town=s land
development code.[27]  The developer objected to the condition Aat every
administrative level in the Town@ and
requested that the Town grant an exception that was available under the code,
all to no avail.[28]  The developer rebuilt the road as requested
and then brought an inverse condemnation claim.[29]  The supreme court
stated that for purposes of determining when a government=s
conditioning approval of development on an exaction constitutes a compensable
taking, Awe see no
important distinction between a dedication of property to the public and a
requirement that property already owned by the public be improved.@[30]  Based on that holding in Stafford, HEB
argues that the exaction in this case constituted a compensable taking.

Ripeness Requirement for
Regulatory Takings Claims








As with
any other claim, under both federal and Texas law, a regulatory takings claim
must be ripe before a trial court will have subject matter jurisdiction over
the claim.[31]  In analyzing the ripeness of a challenge to a
land use regulation under the Texas constitution, we apply federal
jurisprudence.[32]








Under
federal law, as a prerequisite to the ripeness of regulatory takings claims,
there must be Aa final decision regarding the
application of the regulations to the property at issue.@[33]  That is, Aa
landowner may not establish a taking before a land‑use
authority has the opportunity, using its own reasonable procedures, to decide
and explain the reach of a challenged regulation.@[34]  Generally, until these procedures have been
followed, no regulatory taking has been established because the extent of the
restriction on the property is not yet known.[35]  In other words, A>[a] court
cannot determine whether a regulation goes Atoo far@ unless
it knows how far the regulation goes.=@[36]








Usually a
Afinal
decision@ for
purposes of a regulatory takings claim means Aboth a
rejected development plan and the denial of a variance from the controlling
regulations.@[37]  But there is no requirement that an applicant
make futile variance requests or reapplications.[38]  Thus, the requirement that a request for a
variance be denied is applied flexibly so as to give the government an
opportunity to A>grant
different forms of relief or make policy decisions which might abate the
alleged taking.=@[39]  The term Avariance@
encompasses A>other
types of permits or actions [that] are available and could provide similar
relief.=@[40]  If a plaintiff brings a facial challenge to a
regulation (rather than an as-applied challenge), no final decision about the
regulation=s application is required.[41]  HEB brought an as-applied challenge to the
ordinance in this case.








Neither
the United States Supreme Court nor the Supreme Court of Texas has expressly
stated that the standard for determining ripeness of other regulatory takings
claims applies to land-use exaction takings claims.  But we see no reason to apply a different
standard,[42]
as the purpose of the ripeness requirement for regulatory takings cases
generally would also apply to land-use exactions cases.  That is, whether the regulation is used to
deny development approval or to exact some public benefit, we do not know if
the regulation goes too far if we do not know how far it goes, and the
government must be given the chance to abate the alleged taking.  In the context of land-use exactions cases,
what acts by the government will constitute a denial of a development plan
will, as in other regulatory takings cases, turn on the facts of each
case.  Although a landowner may not
receive an outright denial of approval of a plan that does not include the
exaction, the government may give conditional approval in a manner that makes
reasonably clear that the conditional approval is the functional equivalent of
a denial of any plan that does not include the exaction.[43]  Just as in other regulatory takings cases,
the landowner must object to the exaction so as to give the government the
opportunity to exercise its discretion and to establish the permissible uses of
the property Ato a reasonable degree of
certainty.@[44]

HEB=s
Development Application








In this
case, HEB did not submit a development application that excluded the requested
improvements and that was denied by P&Z, and it
is P&Z, not staff, that by City ordinance has
authority to deny plat applications.[45]  Furthermore, even if comments by City staff
or council regarding their interpretation of the ordinance could constitute a
preemptive denial of such an application, notwithstanding P&Z=s
authority over such matters, it is uncontroverted that HEB never applied for a
variance.

HEB
argues, however, that it did not have to request a variance because doing so
would have been futile.  HEB contends
that it worked with City staff to try to avoid having to comply with the
ordinance.  The record shows that the
City council would not amend its ordinance and that the City staff and City
council showed every sign of expecting HEB to comply with the ordinance in
accordance with City staff=s
interpretation of that ordinance.  The
City=s
attorney even told HEB that the City would not have any more meetings with
HEB.  But all of HEB=s
attempts to avoid application of the ordinance involved trying to amend the
ordinance or the City=s interpretation of the
ordinance, rather than seeking a variance. 









A city=s refusal
to amend its ordinance is not a P&Z board's
refusal to grant a variance.  The
ordinance in this case expressly provides that P&Z
may grant a variance and that P&Z=s
decision on the matter is final.  P&Z is not the same as City staff or City council.  Although the record shows City council=s
position on amending the ordinance, nothing in the record shows that P&Z would not have granted a variance to HEB.  

HEB=s
representative testified in the hearing on the plea to the jurisdiction that

[w]e are going forward on the basis that no
variance is requested because no variance is requested by any developer in the
City . . . .  That=s not how the ordinance is operated, and there is
no creek that has been repaired by the City . . . under any variance is done
under the ordinance [sic].

 

But he went on to acknowledge
that, with respect to other completed developments that were subject to the
ordinance, AI=m not
sure that I have knowledge of whether variances were sought.@  Nothing in the record demonstrates that other
developers had requested variances from the same ordinance and that P&Z never granted those requests.  








HEB=s
representative also stated that he had discussed the option of a variance with
the City=s
director of public works, Aand . . .
we knew we didn=t have
any staff support for a variance.@  But the opinion of staff is not the same as a
determination from P&Z.  This case is different from Stafford,
in which the developer sought an exception to the applicable regulation, which
was denied.[46]  Although Patterson testified that the City=s
attorney informed HEB=s attorney that there would be Ano more
meetings,@ his testimony does not indicate
that HEB sought a meeting about the possibility of obtaining a variance or
about anything other than changing the ordinance or City staff=s
interpretation of the ordinance.  And
nothing in the record indicates that the City=s
attorney had been authorized to speak on behalf of P&Z
with respect to variance requests.[47]

HEB
argues that the staff recommendation stated that no permit application would be
approved unless HEB paid for the creek improvements.  But the staff recommendation on its face does
not show that the City or P&Z would not allow HEB
to develop its property without paying for creek improvements.  The relevant staff comment simply states that
the development Amust comply with the provisions
of [the stormwater ordinance,]@ without
stating what compliance would entail or whether staff would recommend denial of
a variance, let alone what P&Z would do.  And this language was apparently included at
HEB=s
request.  Originally, the staff
stipulations stated that A[t]he Homeowner=s
Association shall be required to enter into a perpetual maintenance agreement
with the City for the area shown as floodplain.@  HEB requested that the stipulation be moved
to Ainformational
comments@ and be
amended.  Staff=s
response to the requested change included this note: 

The approved stipulation [as originally worded] reflects staff=s interpretation of [the stormwater ordinance]. 
The ordinance provides the city with the ability to >elect= who is responsible for
the maintenance of the drainage area. 
Staff concurs that this determination is more appropriate during the
review of the final plat and engineering plans.  [Emphasis added]. 

 








Rather than stating that the City
was at that point requiring HEB to improve the creek, it appears that the City was
leaving open until the final platting stages the question of who would have to
pay for maintenance of drainage areas in the development.  It does not show that at the time HEB filed
its preliminary plat applications, the City would not approve any development
unless HEB paid for creek improvements and that P&Z
would not grant a variance.








HEB
compares this case to Mayhew and argues that under that case, its
regulatory takings claims are ripe.  In Mayhew,
landowners seeking to build a planned development on their property worked for
years with the Town of Sunnyvale to obtain a permit to develop their property.[48]  The Mayhews spent
over $500,000 conducting studies and preparing reports in support of their
proposed development.[49]  P&Z recommended
denying the Mayhews=
application.[50]  The Mayhews then
met with a Town committee that had been appointed to negotiate with them and agreed
to change their application in attempt to gain approval from the Town council.[51]  The amended development plan represented the
minimum development that the Mayhews believed would
make an economically viable use of their land.[52]  But although the Mayhews
amended their application to conform with the
tentative agreement resulting from the negotiations, the Town council rejected
the Mayhews= modified
application.[53]  The supreme court
held that under these facts, the Mayhews= claim
was ripe.[54]

HEB
asserts the facts in Mayhew are similar to the facts in this case.  It argues that it hired experts to meet with
City officials over a span of more than two years, costing HEB more than
$600,000, and that the City gave no indication of approving any plan that did
not include HEB constructing improvements to Dudley Branch.  Thus, HEB argues, as in Mayhew, it was
not required to submit an application that did not include the improvements,
and any request for a variance would have been futile.  








But this
case is factually distinguishable from Mayhew.  Mayhew involved a planned development,
and in a planned development, Athe
density, type, and location of particular uses in the development are left to
the planning process and are determined through negotiations between the
developer and the town.@[55]  In this case, HEB wished to construct a
residential subdivision, not a planned development, and its negotiations with
the City centered on its efforts to have the ordinance amended or to change
City staff=s interpretation of the
ordinance, not on the type of development and uses that would be included on
the property.  Furthermore, in Mayhew,
a holding that the developer had not exhausted its administrative remedies
would have required the developer to expend resources and the town to spend
time considering a development proposal that, due to economic impracticability,
the developer would never actually develop.[56]  And, importantly, Athere was
no issue that the proper entity had not rejected the development application.@[57]  In this case, however, nothing shows that HEB
would not have developed the property if it had to pay for the improvementsCin fact, the opposite is true because it did develop the
property and pay for the improvements. 
And HEB also failed to show that it sought relief from the application
of the stormwater ordinance from the right entity.








In a post‑submission letter brief, HEB notes that the City
had stated in its brief that the plat as ultimately constructed was dictated by
federal requirements and that the type of project was under a nationwide
project through the United States Army Corps of Engineers, which only allowed
for a particular type of project.  HEB
asserts that P&Z could not waive these
requirements.  HEB appears to argue that
it was not required to file an application or variance because the City could
not waive the federal requirements. But even if federal requirements dictated
what kind of improvements had to be made, this does not mean that the City
could not elect to make the improvements itself or
that the parties could not have reached some mutually‑satisfactory
agreement for the improvements.  And HEB
claims in its letter brief that certain City officials could provide
relief, acknowledging that the federal creek improvement requirements did not
require HEB to pay for them.  HEB makes no
explanation for why, given federal Corps of Engineers requirements, City
council would have authority to amend the stormwater
ordinance and City staff would have authority to interpret the ordinance in a
manner that did not require HEB to pay for the improvements, but P&Z would not have authority to grant a variance.  The problem, once more, is that HEB never
asked the appropriate agency about a variance in the first place.

The
ordinance allows P&Z to grant a variance, and HEB
never asked for one.  Instead, it entered
into a development agreement with the City in which it agreed to construct the
improvements.  Because ripeness requires
a showing that the landowner asked for a variance or that requesting one would
have been futile, to affirm the trial court=s denial
of the plea to the jurisdiction, this court would have to hold that as long as
one unit of city government wants to condition permit approval on an exaction,
it is not necessary for the landowner to request relief from a different
government unit with express authority to grant that relief.  We decline to do so.  Accordingly, we hold that under the facts of
this case, HEB=s regulatory takings claims under
the federal and state constitutions are not ripe, and, because it is too late
to obtain a variance to avoid constructing the improvements, the claims can
never become ripe.  We sustain the City=s first
issue.








III.  Physical Takings Claim Based on Damage
to Property

In its
second issue, the City argues that the trial court does not have subject matter
jurisdiction over HEB=s inverse condemnation claim
based on physical damage because the evidence conclusively establishes that HEB
did not own the property subject to this suit at the time the events complained
of occurred. 

In its
petition, HEB asserted that

[t]he City=s failure to develop and
maintain drainage facilities sufficient to accommodate the water run-off
created by and after the development of [the parkway] as well as the negligent
construction and maintenance of City-owned drainage channel through HEB=s property resulted in the
taking, damaging and/or diminution in value of the property in violation of the
United States and Texas Constitutions.

 

HEB further alleged that A[t]he
City=s illegal
use of drainage over, across and through HEB=s
property reduced HEB=s developable property and
increased HEB=s development costs, thereby
devaluating the whole property.@








But in
HEB=s
response to the City=s plea to the jurisdiction
alleging that HEB had no standing on a physical takings claim based on events
prior to 1999, HEB stated that it had standing to assert takings claims that
occurred prior to 1999 but that it A[did] not
seek to recover compensation for a taking that occurred prior to@ that
time.  In its brief on appeal, HEB again
argues that it does not lack standing to assert takings claims that occurred
prior to 1999, but its arguments in that respect all relate to the City=s
application of the stormwater ordinance and HEB=s
regulatory takings claim.  HEB
specifically states that AHEB seeks to recover damages
resulting from the City=s exaction of improvements
developed and financed by HEB@ and that
A[t]here
is no evidence to establish HEB did not own the property at the time the exaction
claim was ripe for adjudication.@  [Emphasis added.]  HEB uses the City=s acts in
constructing the parkway and realigning Dudley Branch as taking control of
Dudley Branch and thereby, under HEB=s
interpretation of the stormwater ordinance,
obligating the City to maintain Dudley Branch. 
HEB does not appear to point to the City=s actions
prior to 1999 for any other purpose than to support its exaction claim.

From its
brief, then, it appears that HEB did not assert a separate physical takings
claim apart from its regulatory takings claim based on an exaction.  That is, HEB=s
statements about the City=s actions in constructing and
failing to maintain the parkway and related drainage improvements were in
support of its regulatory takings claim rather than an assertion of a separate
takings claim based on physical damage to HEB property.  We therefore overrule the City=s second
issue.

IV.  Conclusion

Having
sustained the City=s first issue and overruled the
City=s second
issue, we reverse the trial court=s denial
of the City=s plea to the jurisdiction.  We render judgment dismissing HEB=s
regulatory takings claims, and we remand this cause to the trial court for
further proceedings on HEB=s
remaining claims.

 

 

LEE ANN DAUPHINOT








JUSTICE

 

PANEL:  DAUPHINOT, MCCOY, and
MEIER, JJ.

 

DELIVERED:  June 17, 2010











[1]Mayhew v. Town of
Sunnyvale,
964 S.W.2d 922, 928 (Tex. 1998), cert. denied,
526 U.S. 1144 (1999).





[2]City of Arlington v.
Randall,
301 S.W.3d 896, 905 (Tex. App.CFort Worth 2009, pet.
filed).





[3]Id.





[4]Id.





[5]Id.





[6]Id.





[7]Id.





[8]Id.





[9]Id.





[10]City of Houston v. Texan
Land & Cattle Co., 138 S.W.3d 382, 387 (Tex. App.CHouston [14th Dist.] 2004,
no pet.). 





[11]Compare id. (reviewing the trial court=s judgment on an inverse condemnation claim
brought by a property owner), with Bauer v. Lavaca‑Navidad
River Auth., 704 S.W.2d 107, 108 (Tex. App.CCorpus Christi 1985, writ
ref=d n.r.e.)
(reviewing the trial court=s award of damages in a
condemnation proceeding brought by a state conservation and reclamation
district).





[12]Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 537, 125
S. Ct. 2074, 2080B81 (2005). 





[13]See City of Argyle v.
Pierce, 258 S.W.3d 674, 683 (Tex. App.CFort Worth 2008, pet. dism=d); see also Lingle, 544 U.S. at 547, 125 S. Ct. at 2087 (discussing
theories of takings under the federal constitution).





[14]Lingle, 544 U.S. at 538, 125 S.
Ct. at 2081; see also Sheffield Dev. Co., Inc. v. City of Glenn
Heights, 140 S.W.3d 660, 671 (Tex. 2004).





[15]See Loretto
v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 421, 102
S. Ct. 3164, 3168 (1982).





[16]See Sheffield, 140 S.W.3d
at 671 (AThe direct, physical
effect on property, though short of government possession, makes the regulation
categorically a taking.@).





[17]Lingle, 544 U.S. at 538, 548,
125 S. Ct. at 2081, 2087; Hallco Tex., Inc.
v. McMullen County, 221 S.W.3d 50, 56 (Tex.
2006).





[18]Penn Cent. Transp. Co. v.
City of N.Y.,
438 U.S. 104, 124, 98 S. Ct. 2646, 2659 (1978) (setting out factors for
evaluating regulatory takings claims under the federal constitution); see
also Lingle, 544 U.S. at 537B38, 125 S. Ct. at 2081
(noting that a regulation that Agoes too far@ will constitute a taking and that regulatory
takings challenges outside of the two per se regulatory takings categories and
the context of land-use exactions are governed by the standards set out in Penn
Central); Hallco Tex., Inc., 221 S.W.3d at 56.





[19]See, e.g., Mayhew, 964 S.W.2d at 929, 937 (evaluating a town=s denial of development
approval under Penn Central standards and noting that in order for a
regulatory takings claim to be ripe, there usually must be a rejected
development plan).





[20]See Lingle, 544 U.S. at 548, 125 S.
Ct. at 2087; see also Town of Flower Mound v. Stafford Estates L.P., 135
S.W.3d 620, 630 (Tex. 2004) (distinguishing between a
takings claim based on an exaction and takings claim based on A>unreasonable regulatory
interference,=@ that is, a APenn Central@ takings claim).





[21]See Lingle, 544 U.S. at 547, 125 S.
Ct. at 2087 (discussing Dolan v. City of Tigard, 512 U.S. 374, 114 S.
Ct. 2309 (1994), and Nollan v. Cal. Coastal
Comm=n, 483 U.S. 825, 107 S. Ct.
3141 (1987)).





[22]Stafford, 135 S.W.3d at 623.





[23]Id. at 630B31.





[24]See City of Monterey v.
Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 702B03, 119 S. Ct. 1624, 1635B36 (1999) (stating that
the court had not extended Dolan=s Arough proportionality@ test beyond the context
of exactions, which it referred to as Aland-use decisions conditioning approval of
development on the dedication of property to public use@).





[25]Stafford, 135 S.W.3d at 640.





[26]Id. at 622.





[27]Id. at 623.





[28]Id. at 624.





[29]Id.





[30]Id. at 640.





[31]Mayhew, 964 S.W.2d
at 928 (noting that ripeness is an element of subject matter jurisdiction).





[32]Id. at 928B29.





[33]Id. at 929.





[34]Palazzolo v. Rhode Island, 533 U.S. 606, 620B21, 121 S. Ct. 2448, 2459
(2001).





[35]Id.





[36]Id. at 622, 121 S. Ct. at 2460
(quoting MacDonald, Sommer & Frates v. Yolo County, 477 U.S. 340, 348, 106 S. Ct.
2561, 2566 (1986)).





[37]Mayhew, 964 S.W.2d at 929. 





[38]Id. 





[39]Id. (quoting S. Pac.
Transp. Co. v. City of Los Angeles, 922 F.2d 498,
503 (9th Cir. 1990), cert. denied, 502 U.S. 943 (1991)).





[40]Id. at 930 (quoting S.
Pac. Transp. Co., 922 F.2d at 503).





[41]Id.





[42]See, e.g., Stafford, 135 S.W.3d at 638 (noting that there is no practical difference
between Aapproval on condition and
denial for want of the condition@); Mayhew, 964 S.W.2d
at 929 (stating broadly that Ain order for a regulatory takings claim to be
ripe, there must be a final decision regarding the application of the
regulations to the property at issue@); see also City of Dallas v. Chicory Court
Simpson Stuart L.P., 271 S.W.3d 412, 421B22 (Tex. App.CDallas 2008, pet. denied) (applying
the ripeness standards of regulatory takings claims generally to an exactions
takings claim); but see Del Monte Dunes, 526 U.S. at 703, 119 S.
Ct. at 1635 (distinguishing between exactions cases and denial-of-development
cases).





[43]Stafford, 135 S.W.3d
at 638 (noting that there is no practical difference between conditional
approval and denial for want of a condition).





[44]Palazzolo, 533 U.S. at 620, 121 S.
Ct. at 2459 (noting that a takings claim is ripe Aonce it becomes clear that
the agency lacks the discretion to permit any development, or the permissible
uses of the property are known to a reasonable degree of certainty@).





[45]Carrollton,
Tex., Subdivision Ordinance, art. III., ' A (1993) (stating that a plat application is
considered filed when it has been submitted to the planning department and
placed on the agenda for P&Z and that a plat
shall be considered approved if it is not disapproved by P&Z
within thirty days of filing), amended by Carrollton, Tex., Ordinance
3301 (2009).





[46]See Stafford, 135 S.W.3d at 624.





[47]See Desoto Wildwood Dev.,
Inc. v. City of Lewisville, 184 S.W.3d 814, 826
(Tex. App.CFort Worth 2006, no pet.) (stating
that because no evidence showed that the city attorney had been authorized by
the city council to act for it on a matter, the attorney=s statements were not
binding on the matter).





[48]Mayhew, 964 S.W.2d
at 925B26.





[49]Id. at 926.





[50]Id.





[51]Id.





[52]Id. at 931.





[53]Id.





[54]Id. at 932.





[55]Id. at 931.





[56]Desoto, 184 S.W.3d
at 826 (distinguishing Mayhew). 





[57]Id.