**CITY OF DALLAS, Appellant**

v.

**CHICORY COURT SIMPSON STUART, L.P., Appellee.**

No. 05–08–00262–CV.

Court of Appeals of Texas, Dallas.

Nov. 24, 2008.

---

James Pinson, Barbara E. Rosenberg, Kenneth R. Bennett, Office of City Atty., Dallas, for Appellant.

Martha J. Hardwick, Joe Chumlea, Shakelford, Melton & McKinley L.L.P., Dallas, for Appellee.

Before Chief Justice THOMAS and Justices WRIGHT and MAZZANT.

## OPINION

Opinion by Justice MAZZANT.

Chicory Court Simpson Stuart, L.P. sued the City of Dallas, claiming that the City unconstitutionally took Chicory's property without just compensation. The City filed a plea to the jurisdiction, which the trial court denied. The City timely filed this interlocutory appeal asserting three points of error. We reverse the trial court's order and render a judgment of dismissal in favor of the City.

## I. BACKGROUND

### A. Pleadings

In its live pleading, Chicory alleges the following. It owns a piece of property in Dallas, Texas, on which it desired to build a housing development called Pecan Grove. From fall 2004 through March 2005, representatives of Chicory and the City discussed drainage measures Chicory would have to install on the property to obtain the City's approval of the project. The City took the position that Chicory had to build a storm sewer sufficient to accommodate anticipated increased future drainage from an as-yet unfinished neighboring subdivision. Chicory alleges that it requested an exception from this requirement and that the City denied its request. Chicory eventually built the storm sewer at a cost of $372,440.52 and dedicated it to the City. The City rejected Chicory's demand for reimbursement for the cost of the sewer, and Chicory then sued the City for an unconstitutional taking of its property, invoking both the Texas and federal constitutions.

### B. Plea to the jurisdiction

The City filed a plea to the jurisdiction and a supplemental plea to the jurisdiction based on several different grounds. Chicory filed a response, and both sides filed evidence, such as affidavits and deposition excerpts, to which the other side filed objections. The trial court heard the City's pleas to the jurisdiction and permitted Chicory to call one live witness at the hearing. The court signed orders denying the City's pleas to the jurisdiction and ruling on the evidentiary objections. The City perfected this interlocutory appeal as permitted by section 51.014(a)(8) of the Texas Civil Practice and Remedies Code.

## II. STANDARD OF REVIEW AND BURDEN OF PROOF

We review the trial court's ruling on a plea to the jurisdiction under a de novo standard. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 228 (Tex.2004). If the plea challenges the sufficiency of the claimant's pleadings, the trial court must construe the pleadings liberally in the claimant's favor and deny the plea if the claimant has alleged facts affirmatively demonstrating jurisdiction to hear the case. If the pleadings are insufficient, the court should afford an opportunity to replead if the defects are potentially curable but may dismiss if the pleadings affirmatively negate the existence of jurisdiction. *Id.* at 226–27.

If the plea to the jurisdiction challenges the existence of jurisdictional facts, the trial court must consider relevant evidence submitted by the parties. If the evidence creates a fact question regarding jurisdiction, then the trial court cannot grant the plea to the jurisdiction, and the fact issue will be resolved by the factfinder. But if the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law. *Id.* at 227–28. "[T]his standard generally mirrors that of a summary judgment under Texas Rule of Civil Procedure 166a(c).... By requiring the [political subdivision] to meet the summary judgment standard of proof in cases like this one, we protect the plaintiffs from having to put on their case simply to establish jurisdiction." *Id.* at 228 (internal quotations and citation omitted); *accord Dallas County v. Wadley*, 168 S.W.3d 373, 377 (Tex.App.-Dallas 2005, pet. denied) ("[On a plea to the jurisdiction,] the burden is on the government to meet the summary judgment standard of proof.").

## III. ANALYSIS

### A. Overview of takings claims

The Texas Constitution provides that "[n]o person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person." TEX. CONST. art. I, § 17. Similarly, the Just Compensation Clause of the Fifth Amendment provides that "private property [shall not] be taken for public use without just compensation." U.S. CONST. amend. V. The Just Compensation Clause applies to the states by operation of the Fourteenth Amendment. *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 933 (Tex.1998).

If a governmental entity takes, damages, or destroys property for public use without process or proper condemnation proceedings, governmental immunity is waived, and an action for inverse condemnation will lie. *City of Dallas v. Blanton*, 200 S.W.3d 266, 271 (Tex.App.-Dallas 2006, no pet.). The elements of inverse condemnation are (1) an intentional governmental act (2) that takes, damages, or destroys the plaintiff's property (3) for public use. *Id.* Takings can be classified as either physical or regulatory takings. *Mayhew*, 964 S.W.2d at 933. One kind of regulatory taking occurs when the government conditions its approval of a proposed development on some exaction from the developer. *Town of Flower Mound v. Stafford Estates Ltd. P'ship*, 135 S.W.3d 620, 634 (Tex.2004); *see also Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 548, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005) (referring to the "land-use exaction" taking theory). This is an exaction taking case.

### B. Ripeness of state law takings claim

In the first of the City's three points of error on appeal, it argues that the trial

court lacks subject-matter jurisdiction over Chicory's state law takings claim because that claim is not, and can never become, ripe.

### 1. Law of ripeness

■ Both sides cite *Mayhew v. Town of Sunnyvale* as the leading Texas case on this subject. According to *Mayhew*, ripeness is an element of subject-matter jurisdiction. 964 S.W.2d at 928. We look to the experience of the federal courts in determining the ripeness of constitutional challenges to land-use regulations. *Id.* at 928–29. An exaction takings claim is not ripe until the relevant governmental entity has made "a final and authoritative determination of the type and intensity of development legally permitted on the subject property." *Id.* at 929 (internal quotations omitted). This is because "a court cannot determine whether a taking or other constitutional violation has occurred until the court can compare the uses prohibited by the regulation to any permissible uses that may be made of the affected property." *Id.*

> Accordingly, in order for a regulatory takings claim to be ripe, there must be a final decision regarding the application of the regulations to the property at issue.... A "final decision" usually requires both a rejected development plan and the denial of a variance from the controlling regulations.... However, futile variance requests or re-applications are not required.... Moreover, the term "variance" is "not definitive or talismanic;" it encompasses "other types of permits or actions [that] are available and could provide similar relief." ... The variance requirement is therefore applied flexibly in order to serve its purpose of giving the governmental unit an opportunity to "grant different forms of relief or make policy decisions which might abate the alleged taking."

*Id.* at 929–30 (citations omitted). Ripeness thus requires action by both the landowner and the governmental unit. First, the landowner "must give a land-use authority an opportunity to exercise its discretion." *City of Sherman v. Wayne*, 266 S.W.3d 34, 41 (Tex.App.-Dallas 2008, no pet.). Then the governmental unit must make a final decision. "[O]nce it becomes clear that the agency lacks the discretion to permit any development, or the permissible uses of the property are known to a reasonable degree of certainty, a takings claim is likely to have ripened." *Id.*

The City contends that Chicory's claims are not ripe because it never obtained a final determination as to what drainage system the City would require as a condition of development.

### 2. Evidence pertaining to ripeness

We review the ripeness evidence before the trial court in the light most favorable to Chicory, as prescribed by the supreme court in *Miranda*, 133 S.W.3d at 227–28. The question is whether the evidence establishes that Chicory failed to ripen its claim by securing a denial of a development plan and a request for a variance.

#### a. The lay of the land

In late 2004 or early 2005, Chicory bought an undeveloped 30-acre tract of land in the City of Dallas on the north side of Simpson Stuart Road, which runs generally east-west. Chicory's purpose in buying the property was to build a 250-unit townhome development called Pecan Grove. The project was to be financed by tax-exempt mortgage revenue bonds issued by the Texas Department of Housing and Community Affairs. In September 2004, the City Council approved an ordinance changing the zoning of the property from a single-family district to a planned-development district. The ordinance required all drainage structures, if any, to be

"constructed in accordance with standard city specifications, and completed to the satisfaction of the director of public works and transportation."

On the south side of Simpson Stuart Road, across from Chicory's property, is a tract on which a third party called KB Homes was already developing a City-authorized subdivision called College Terrace. Some of the houses and streets making up that subdivision were already in place when Chicory embarked on its development plan. College Terrace was being built in phases and was still under development at the time of this litigation.

The Chicory and KB Homes tracts slope from south to north. Water running off the KB Homes tract would flow north, travel through two concrete pipes under Simpson Stuart Road, and continue northward along a watercourse through the western part of Chicory's land. The watercourse was described variously in the evidence as a "creek" or a "swale," and Chicory's evidence tended to show that the course was dry except when it rained, at which time water would collect and flow northward through the swale. Chicory's engineers recommended that some drainage measures be undertaken because the existing drainage of the property could affect the planned site of the Pecan Grove clubhouse. The engineers also gauged the current flows of water across the property and, at the City's request, assessed the probable flows of water in the future based on a completed development of College Terrace by KB Homes. The engineers expected the amount of water flowing across Chicory's property to increase as the amount of impervious ground cover in College Terrace increased. The City's and Chicory's engineers were in agreement as to the calculations of existing water runoff and projected future runoff.

### b. Chicory meets with City representatives in November 2004

Drainage proved to be a point of contention between Chicory and the City. Chicory wanted approval for a drainage system sufficient to accommodate the existing flow of water across the property and to accommodate any additional drainage that its own development would create. In Chicory's view, the City could not legally require it to build a drainage system at its own cost to accommodate future runoff resulting from further development of College Terrace; rather, because KB Homes owned no easement across Chicory's property, KB Homes bore the responsibility of ensuring that its development did not cause additional flooding of Chicory's property.

On November 1, 2004, two of Chicory's engineers, Robert Manaois and D. Reed Phillips, attended a pre-development meeting with several City representatives including Johnny Sudbury, whom Manaois understood to be the City's representative in charge of drainage issues. The purpose of the meeting was for Chicory to get information from the City so that it could obtain the necessary permits in an expedited fashion. The site plan under discussion at the meeting did not show any drainage facilities, so drainage was discussed orally. Chicory's first suggestion was to divert the flow of water but to keep the entire watercourse above ground, as it already was. The City's representatives, however, said that Chicory could either leave the existing drainage features unaltered (which would not permit the full development Chicory envisioned) or construct an underground storm sewer to accommodate the projected future flow of runoff. In his deposition, Manaois testified as follows:

> We asked [Sudbury] whether we could do something that was over land and ditch it all down due to the cost of

constructing such a large storm sewer. And he said, No, you have to build it. And he said that he wouldn't accept any plans that were submitted that didn't show it.

The evidence established that Chicory never submitted a written plan to the City that proposed solely above-ground drainage solutions in the form of berms and ditches. Manaois testified in his deposition that no plan containing a "basin or berm-type solution" was ever submitted. Two other Chicory witnesses (Phillips, in his live testimony, and Chicory Vice President James R. Fisher, in his deposition) seemed to indicate that a written berm plan was submitted, but both witnesses subsequently retracted their statements. We conclude that any fair-minded and reasonable fact-finder would conclude that these witnesses' initial testimony that Chicory submitted a written plan involving solely above ground drainage was mistaken and would not credit it. *See City of Keller v. Wilson,* 168 S.W.3d 802, 827–28 (Tex.2005) (discussing reasonable fact-finder standard applicable in legal-sufficiency review).

We conclude that the evidence establishes that Chicory never submitted a written plan involving only above-ground drainage to the City for approval.

**c. Ongoing negotiations with the City**

After the November 1 meeting, Chicory allegedly submitted a preliminary plat to the City Plan Commission. Although we have not found that document in the record, the record does contain the City Plan Commission's letter of January 7, 2005 advising that Chicory's preliminary plat was approved, subject to numerous conditions. One of those conditions was that "Development Services, Engineering Division must verify that the plat conforms with water, wastewater and easement re-quirements under the provisions of Chapter 49 of the Dallas City Code." Another condition was the submission of drainage plans to the same City agency.

Meanwhile, Chicory's engineers began to craft other drainage alternatives short of (and cheaper than) building an underground storm sewer running all the way to Simpson Stuart Road. Viewing the evidence in the light most favorable to Chicory, we conclude that the evidence shows that Chicory submitted one written drainage plan to the City in December 2004. In that plan, Chicory proposed a partial underground storm sewer that did not run all the way to Simpson Stuart Road and did not connect to the pipes running under the road. This plan, involving an above-ground gap between the pipes and the beginning of the storm sewer, would have been less expensive than building a completely underground storm sewer that connected with the pipes under the road. There was some evidence that the City rejected this plan.

Chicory engineer Manaois also testified that he met with Sudbury on at least three occasions from late November 2004 through early January 2005 to discuss the drainage issue, and Sudbury said that he believed City ordinances required the construction of the underground storm sewer if Chicory did anything to alter the existing flow of water across the property. During the discussions, Manaois raised the possibility of building a detention pond to collect the runoff, which would then drain through an underground pipe. The pond would slow the rate of drainage and thus allow the use of a smaller and less expensive pipe. Sudbury did not rule out the possibility of approval for such a solution, but he also said there was no guarantee that it would be approved. He went on to say "that it would take a very long time for him to review that because he would have

to look at it in very close detail." At this point, however, there were time constraints on the funding of the project that made it unfeasible for Chicory to take a chance on a lengthy review and a potential denial of permission at the end. Thus, this alternative was never submitted in written form. Manaois further testified that he drew up no other written plans for drainage options other than what "ended up happening," i.e., the completely underground storm sewer.

The record next contains a second plan review sheet dated March 1, 2005. That sheet indicates that the City received a new submission from Chicory on February 7, 2005. The second plan review sheet also contains six "storm drainage comments" directing Chicory to correct and revise various matters. The documents that made up Chicory's submission, however, are not identified.

### d. The last conference between Chicory and the City in March 2005

On March 10, 2005, Fisher and other Chicory representatives met with City officials including Elias K. Sassoon, assistant director and chief engineer of the department of development services. Fisher and Sassoon both submitted affidavits recounting that meeting. According to Sassoon, Fisher opened the meeting by stating his understanding that the City was requiring him to install an underground drainage system as part of his proposed development. Sassoon further attested that he told Fisher that the City never required him to pursue a development plan that included enclosure of the existing creek and that the City would prefer the creek to be left in its natural state.[1] According to Fisher, Chicory requested an exception from the requirement that it construct the underground storm sewer and warned the

City that it viewed such a requirement as a "taking" of its property. Fisher further swore that Sassoon denied Chicory's request for an exception, citing without specificity the Dallas City Code as grounds for the denial. He also averred that Sassoon emphasized that Chicory would have to build a drainage system capable of handling future runoff after the upgradient property nearby was fully developed. There appears to be no evidence that Chicory presented any written development plan at the meeting. The only document mentioned in the affidavits is a survey map of the undeveloped property that Sassoon swore he used for discussion purposes.

On March 14, 2005, Fisher and Sassoon exchanged emails. First, Fisher wrote to Sassoon that Chicory was proceeding to begin construction and would "complete the storm drainage as designed, subject to your final approval. The issue outstanding is who pays the cost for the work on this public improvement." Sassoon responded that Chicory was required to design and build a drainage system "based on fully developed runoff conditions in the upstream" and that Chicory was "fully responsible for the design and also the construction of the drainage system per the Dallas City Code." He concluded, "Further, as I indicated in our meeting, you do not have to install any underground drainage system." Finally, Fisher replied in an email in which he reiterated that Chicory would build the system but was not waiving its right to seek "reimbursement from the City as permitted by applicable State law." Subsequently, Chicory built the underground storm sewer at a cost of $372,440.52 and dedicated it to the City as required by the City.

### 3. Application of the law to the facts

---

1. Fisher testified in his deposition that leaving the creek in its natural state was not feasible because it would have prevented Chicory from building on half of its property.

To ripen its taking claim, Chicory both had to give the City an opportunity to exercise its discretion and had to obtain a final decision from the City regarding the drainage system that would be required as a condition of permitting Chicory's development. *See City of Sherman*, 266 S.W.3d at 41. A "final decision" usually requires both a rejected development plan and the denial of a variance from the controlling regulations. *Mayhew*, 964 S.W.2d at 929. The evidence establishes that Chicory did not obtain a final decision as defined by *Mayhew*.

First we review the record for evidence of a rejected development plan. We conclude that the evidence concerning the November 1 meeting does not suffice. The record shows that Chicory orally raised the possibility of an entirely above ground drainage system during this meeting and that it never followed up with any written proposal to the City attempting to demonstrate the feasibility of such a system. This minimal effort by Chicory does not resemble the depth of the development plan proposed by the developer in the *Mayhew* case. In that case, the developers wanted to build a development of over 3,600 units in the town of Sunnyvale, but, as a compromise, they settled on 3,600 units as the lowest number of units that would be economically viable. *Id.* at 931. The developers spent over a year in negotiations with the town and spent over $500,000 preparing and developing their planned development application before submitting it to the town's planning and zoning committee. *Id.* Chicory's oral proposal of an above-ground drainage system did not amount to a "development plan," so the City's oral rejection of that proposal did not constitute the rejection of a development plan.

We conclude that the evidence was sufficient to raise a fact issue as to whether Chicory submitted a written plan in December 2004 that was adequate to constitute an initial development plan. The evidence, viewed in the light most favorable to Chicory, indicates that this plan involved a partially underground storm sewer and would have been less expensive than the completely underground storm sewer that the City expressed a preference for at the November 2004 meeting. There is also some evidence that the City rejected this proposal. Accordingly, for purposes of this opinion, we may assume for the sake of argument that the evidence raises a fact issue at the first step of *Mayhew*: denial of an initial development plan.

However, Chicory did not satisfy the second step of the *Mayhew* ripeness test by pursuing and securing a denial of a variance after its initial development plan was denied. The evidence shows that Chicory representative Manaois engaged in oral discussions with City representative Sudbury about a potential alternative drainage solution that would have been less expensive than the City's preferred solution. The evidence further shows that Sudbury did not reject this concept out of hand and that he said it would take time for him to review any such proposal and approval could not be guaranteed. Manaois testified that Chicory did not have the time to prepare, submit, and await a ruling on plans proposing this variance, and so it never amounted to more than an oral discussion between him and Sudbury. Similarly, evidence shows that the March 2005 meeting between Chicory and City representatives did not involve an adequate request for a variance or even a meaningful discussion of alternative drainage concepts. We conclude that the record establishes that Chicory did not meaningfully request or give the City an opportunity to rule on a variance as required by *Mayhew*. Instead, operating

under time constraints related to funding, it essentially acquiesced in the City's preference for a completely underground sewer system after the City denied its initial December 2004 proposal. Accordingly, Chicory's taking claim relating to its construction of the underground storm sewer never ripened.

Chicory's authorities do not undermine our conclusion. It cites two cases for the proposition that a "final decision" can be based on an oral application rather than a formal, written application. We conclude that these cases are distinguishable. In one, the issue presented did not involve ripeness at all but rather concerned a city's defenses of waiver and estoppel. *Sefzik v. City of McKinney,* 198 S.W.3d 884, 891–92 (Tex.App.-Dallas 2006, no pet.). Moreover, the *Sefzik* case is factually distinguishable in that the developer in that case unsuccessfully "objected to the condition on its development at every administrative level." *Id.* at 893 (internal quotations omitted). That is, the developer obtained a final decision by establishing the city's position with certainty. In the instant case, by contrast, the City's representative advised Chicory that it could submit an alternative drainage plan that would be carefully considered and might be approved, but Chicory never did so. Thus, Chicory's conduct did not accomplish a principal purpose of the variance requirement—giving the governmental unit a reasonable opportunity to abate the alleged taking. *Mayhew,* 964 S.W.2d at 930. Chicory's other authority is factually distinguishable on the same basis. *See Manatuck Assocs. v. Wendt,* No. 3:95CV1006, 1997 WL 766858, at *14 (D.Conn. Nov.21, 1997) (noting that town officials "arrived at a definitive position" as to the developer's oral permit requests).

Chicory argues that it was excused from seeking a variance because any such request would have been futile, citing *Mayhew* and *City of Houston v. Kolb,* 982 S.W.2d 949 (Tex.App.-Houston [14th Dist.] 1999, pet. denied). Again, these cases are factually distinguishable. In *Mayhew,* the developer spent over a year in negotiations with the town, spent over $500,000 preparing and developing its application, compromised with the town, and filed a modified application with the town council that was denied. 964 S.W.2d at 931. Under those particular facts, a further request for a variance was not required to ripen the developer's complaint. *Id.* at 932. In the instant case, however, Chicory obtained a rejection of only a single drainage plan and never submitted an alternative plan, even though the City advised that it would seriously consider an alternative plan if Chicory chose to submit one. *Kolb* is even more distinguishable. The City of Houston denied the developers' application for a subdivision plat because it would have interfered with a planned freeway. 982 S.W.2d at 951. The evidence further showed that the city had no power to relocate the freeway, so any variance request by the developers would have been futile. *Id.* at 954. Under those circumstances, the court of appeals concluded that the developers were excused from requesting a variance. *Id.* There is no evidence of futility in our record, and the evidence indicates that the City was willing to examine any variance request Chicory might care to submit.

### 4. Conclusion

The evidence establishes that Chicory did not obtain a final determination from the City as to the kind of drainage system that would be required as a condition of approval of its planned development. Accordingly, Chicory's inverse condemnation claim never ripened, and the trial court lacks subject matter jurisdiction over Chicory's state law takings claim. We sustain the City's first point of error. We need

not address the City's second point of error in which the City argues alternative bases for reaching the same conclusion.

## C. Ripeness of federal takings claim

■ In the City's third point of error, it contends that Chicory's federal takings claim is not within the trial court's subject matter jurisdiction because the Texas procedure for the recovery of just compensation is adequate and because Chicory can never properly present its state law claim.

■ There are two prerequisites to the ripeness of a federal regulatory takings claim. The first is a final decision by the governmental entity charged with applying the regulations to the property at issue. *Williamson County Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). The second requirement is that the claimant must have used available and adequate state procedures for obtaining compensation (if such procedures exist) and must have been denied just compensation. *Id.* at 195, 105 S.Ct. 3108; *see also Liberty Mut. Ins. Co. v. Brown*, 380 F.3d 793, 796–99 (5th Cir.2004) (applying *Williamson County* requirements). Texas's inverse condemnation action under article I, section 17 of the Texas Constitution is an adequate procedure for just compensation. *Town of Flower Mound v. Stafford Estates Ltd. P'ship*, 135 S.W.3d 620, 646 (Tex.2004). The question thus becomes whether the second *Williamson County* ripeness requirement is satisfied on the facts of this case. We agree with the City that the facts do not satisfy this requirement for ripeness.

The Fifth Circuit recently addressed this issue in its *Liberty Mutual* opinion. In that case, insurance carrier Liberty Mutual contended that the members of the Louisiana Insurance Rating Commission had set the permissible rates for workers'

compensation insurance so low as to amount to a regulatory taking of Liberty Mutual's property. 380 F.3d at 794–95. First it asserted this takings claim in Louisiana state court, but the state court dismissed because Liberty Mutual had bypassed available administrative appeals from the rate-setting orders, and so "no cause of action had accrued to Liberty Mutual." *Id.* at 795–96. Then Liberty Mutual filed suit in federal court on a federal takings theory. The federal district court dismissed for lack of ripeness, and the Fifth Circuit affirmed. *Id.* at 796. The court reasoned that the second *Williamson County* requirement requires the claimant not only to utilize state procedures for obtaining compensation but also to present its claim for compensation "in a posture such that the state court could rule on the merits of [the] claim." *Id.* at 798. "Any other rule would allow plaintiffs to circumvent state courts by failing to comply with state procedural requirements for bringing inverse condemnation claims, thereby nullifying *Williamson County's* requirement that the plaintiff avail itself of the available state procedures for obtaining compensation." *Id.* Thus, because state compensation procedures were available but Liberty Mutual's failure to exhaust state administrative remedies made it impossible for it to obtain a state court ruling on the merits, its federal takings claim was not ripe and was properly dismissed by the district court for lack of jurisdiction. *Id.* at 799.

■ Although Fifth Circuit precedent is not binding on us, even on matters of federal law, *see Penrod Drilling Corp. v. Williams*, 868 S.W.2d 294, 296 (Tex.1993), we find the analysis in *Liberty Mutual* persuasive and apply it here. To utilize available state procedures for obtaining compensation so as to ripen a federal takings claim, a claimant must present its

inverse condemnation to a state court in a posture that permits the court to rule on the merits of the claim. 380 F.3d at 798. In this case, Chicory failed to secure a final determination from the City, which means that Chicory's state law takings claim is not ripe and that the trial court lacks subject matter jurisdiction. Moreover, as in *Liberty Mutual,* it appears that Chicory's state law claim can never become ripe and Texas state courts can never rule on the merits of Chicory's claim. Accordingly, its federal takings claim is now "permanently unripe" as well. *Id.* at 799. We conclude that the trial court lacks subject matter jurisdiction over Chicory's federal takings claim and sustain the City's third point of error.

## IV. CONCLUSION

We conclude the trial court erred by denying the City's plea to the jurisdiction. We reverse the trial court's order denying that plea and render judgment dismissing all of Chicory's claims for lack of subject matter jurisdiction.