**Affirmed in part; Revere and Remand and Opinion Filed August 22, 2014**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-12-00969-CV

## PATSY B. ANDERTON AND DOYLE ANDERTON, INDIVIDUALLY AND D/B/A A-1 GRASS SAND AND STONE, Appellants
## V.
## CITY OF CEDAR HILL, TEXAS, Appellee

### On Appeal from the 14th Judicial District Court
### Dallas County, Texas
### Trial Court Cause No. 09-12187

## OPINION

Before Justices Bridges, Fillmore, and Lewis
Opinion by Justice Bridges

In this summary judgment proceeding, the City of Cedar Hill (the "City") filed suit against appellees Patsy B. Anderton and Doyle Anderton, individually and d/b/a A-1 Grass Sand and Stone ("the Andertons") regarding the alleged nonconforming use status of property, specifically Lot 5, owned by the Andertons. The trial court granted summary judgment in favor of the City regarding the nonconforming use status of Lot 5. The trial court also dismissed the Andertons' counterclaim under Texas Local Government Code chapter 245 and determined their inverse condemnation claim was not ripe for judicial review. On appeal, the Andertons argue (1) numerous fact issues exist regarding the nonconforming use status of Lot 5; therefore, the City is not entitled to summary judgment as a matter of law; (2) their inverse condemnation claim is ripe for judicial review; (3) they have vested rights under chapter 245; and (4) the trial court erred by

awarding the City attorneys' fees. We affirm in part and reverse in part and remand for further proceedings.

## Background

The Cedar Hill, Texas property involved in this lawsuit is described as Lots 5, 6, and 7 in the River Oaks Section 2 Addition located on the west side of U.S. 67. These lots were platted in 1958 and subject to Single Family (R-1) district standards.

Dennis Lynch originally leased the property from James Kelly in 1985. Lynch used part of the property from 1985 to 2000 to run AAA Nursery, Sand and Stone, which he owned. Lynch applied and received a building permit from the City in 1985 allowing for the legal use of Lot 6 for "sand and gravel sales." The permit also allowed for a 448 square-foot building on Lot 6. Lynch then moved a portable building onto Lot 6 and used it for his business.

When the City issued the building permit, the property was zoned "C" for commercial. According to Rod Tyler, the City's Planning Director, the closest definition in the 1985 ordinance for Lynch's use of the property was "building material sales," which was an allowed use in a commercial district.

Although the City's permit describes the "use" of the property as "sand and gravel sales," Lynch's business also sold fill dirt, rock, sand, gravel, flagstone, plants, trees, and firewood. Lynch said he operated his business on both Lots 5 and 6 from 1985 through 2000 and kept material, including fill dirt, on Lot 5.

Later in 1985, the zoning classification of Lot 5 changed to a Special Use ("SU") zoning district for exclusive mini-warehouse storage. The zoning classification remained SU until 2001 when it once again changed as part of a comprehensive overhaul of the City's zoning. The City then zoned it Local Retail ("LR").

Dennis Lynch sold his business to the Andertons in 2000.  They renamed the business A-1 Grass, Sand, and Stone.  At the same time, the Andertons leased Lots 5, 6, and 7 from Kelly.  Doyle Anderton claimed when he took over Lynch's business, the entirety of Lots 5 and 6 were used for the sale of landscaping and building materials.  The Andertons continued to sell the types of building materials sold by Lynch prior to 2000.

The Andertons bought Lots 5, 6, and 7 in 2007.  Later that year, the City began questioning the use of Lot 5 as part of the Andertons' business.  Stacy Graves, a code enforcement supervisor for the City, visited the property and concluded "portions of Lot 4[1], 5, and 7 were being used by A-1 as part of its business in addition to Lot 6.  This included sand, gravel and rock, as well as truck parking . . . such operations were prohibited under the zoning district classification in effect, the Local Retail (LR) District."  The City believed that based on aerial photographs taken in 2001 and thereafter, the Andertons did not expand the outdoor storage, sales, or display associated with the business on Lot 6 to Lot 5 until after the adoption of the 2001 zoning ordinance to LR.  Such expansion was a violation of the zoning ordinance.

In response to the City's questions regarding the Andertons' use of Lot 5, Patsy Anderton filed an application for change of zoning from LR to Commercial or Industrial.  She listed the proposed land use designation as "landscaping sales."  No one at the City ever disputed her listing the use of Lot 5 as "landscaping sales."  However, after a meeting on January 13, 2009, the City Council denied Patsy's proposed zoning change.  Thus, the zoning classification for the lots remained LR.  The City did acknowledge that the "sand and gravel sales/storage facility located on Lot 6 may continue to operate as it has since becoming nonconforming; however, the expansion of this facility onto adjacent lots violates the Cedar Hill Zoning Code."

---

[1] Lot 4 was owned by the City.

The Andertons believed the use of Lot 5 was legally nonconforming and refused to terminate the use. Graves then issued five citations against the Andertons for unlawful expansion of a nonconforming land use as to Lot 5. A jury later unanimously ruled "not guilty" as to all five citations.

The City filed its original petition against the Andertons for violations of its zoning ordinance and building code. It sought declaratory judgment, civil penalties, injunctive relief, and attorney's fees. The Andertons responded by asserting counterclaims against the City for alleged violations of vested rights under chapter 245 of the Texas Local Government Code, inverse condemnation, and violations of federal due process and equal protection rights. The City moved for partial summary judgment on its claims involving the Andertons' use of Lots 5, 6, and 7 as well as the Andertons' counterclaims. The Andertons moved for summary judgment on their counterclaims and on all the City's claims.

The trial court originally denied the City's motion for partial summary judgment on February 28, 2012. However, on the same day, the trial court signed another order granting the City's motion for partial summary judgment. The trial court's order stated "there is no genuine issue of material fact" and further stated (1) the Andertons have no non-conforming use right in Lot 5; (2) the inverse condemnation counterclaim is not ripe for judicial review and is dismissed with prejudice; and (3) the Andertons have no vested rights under Texas Local Government Code chapter 245 and such counterclaim is dismissed. The trial court also ruled on issues pertaining to Lots 6 and 7; however, both parties agree the only issues raised in this appeal involve Lot 5. Accordingly, we affirm the trial court's order as it pertains to Lots 6 and 7.

The trial court entered a final judgment on June 19, 2012. The final judgment incorporated the holdings in the order granting partial summary judgment and several other holdings not relevant to this appeal, which include the City's hybrid motion for summary

judgment disposing of the Andertons' federal law counterclaims and an agreed temporary injunction order regarding Lot 7. This appeal followed.

**Standard of Review**

The standard of review for traditional summary judgment under Texas Rule of Civil Procedure 166a(c) is well established. TEX. R. CIV. P. 166a(c). The movant for summary judgment has the burden of showing there is no genuine issue of material fact and is entitled to summary judgment as a matter of law. *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex. 1985); *In re Estate of Berry*, 280 S.W.3d 478, 480 (Tex. App.—Dallas 2009, no pet.). In deciding whether there is a disputed fact issue precluding summary judgment, evidence favorable to the nonmovant will be taken as true, every inference must be indulged in favor of the nonmovant, and any doubts must be resolved in the nonmovant's favor. *Nixon*, 690 S.W.3d at 549. Once the movant establishes its right to summary judgment as a matter of law, the burden shifts to the defendant to present evidence raising a genuine issue of material fact, thereby precluding summary judgment. *Espalin v. Children's Med. Ctr. of Dallas*, 27 S.W.3d 675, 682 (Tex. App.—Dallas 2000, no pet.). We review the granting of a summary judgment de novo. *Kyle v. Countrywide Home Loans, Inc.*, 232 S.W.3d 355, 358 (Tex. App.—Dallas 2007, pet. denied).

When as here, the summary judgment order specifies the grounds on which it bases summary judgment, we limit our review to those grounds. *Cox v. Upjohn Co.*, 913 S.W.2d 225, 228 (Tex. App.—Dallas 1995, no writ). Further, we note the trial court did not rule on the City's objections to the evidence attached to the Andertons' summary judgment response, and neither party raises an issue related to the summary judgment evidence on appeal. Consequently, all evidence submitted by the parties remains part of the summary judgment proof and will be considered on appeal. *See Kinabrew v. Inergy Propane, LLC*, No. 05-12-01102-CV, 2014 WL

1018168, at *3 (Tex. App.—Dallas Mar. 10, 2014, no pet.) (mem. op); *see also Duncan-Hubert v. Mitchell*, 310 S.W.3d 92, 100 (Tex. App.—Dallas 2010, pet. denied) (concluding that mere granting of summary judgment motion was not implicit ruling on movant's objections to non-movant's summary judgment evidence).

### Nonconforming Use Status of Lot 5

In their first issue, the Andertons argue numerous disputed fact issues exist as to the nonconforming use status of Lot 5. The City responds the Andertons' evidence does not raise any fact issues because Lot 5 has violated, and continues to violate, the City's zoning ordinance regarding nonconforming use status.

A nonconforming use of land is a use that existed legally when the zoning restriction became effective and has continued to exist even though no longer in compliance with currently applicable restrictions. *See City of Univ. Park v. Benners*, 485 S.W.2d 773, 777 (Tex. 1972); BLACK'S LAW DICTIONARY 1540 (7th ed. 1999) (defining "nonconforming use" as "land use that is impermissible under current zoning restrictions but that is allowed because the use existed lawfully before the restrictions took effect"). When determining whether there is a legal nonconforming use in a particular case, the proper focus is on the legislative enactments of the regulation body. *Bd. of Adjustment of the City of San Antonio v. Wende*, 92 S.W.3d 424, 431 (Tex. 2002); *Tellez v. City of Socorro*, 296 S.W.3d 645, 650 (Tex. App.—El Paso 2009, pet. denied). The party claiming privilege to continue a nonconforming use, in this case the Andertons, bears the burden of proving its preexisting status. *See City of Pharr v. Pena*, 853 S.W.2d 56, 63 (Tex. App.—Corpus Christi 1993, writ denied). The City ordinance at issue here, No. 2001-64 section 2.5, provides that a nonconforming use that was lawfully established prior to the effective date of amendatory regulations may continue to operate under the regulations

under which it was established, but shall not be enlarged, increased, or extended to occupy a greater area of land than was occupied at the time the use became nonconforming.

In its motion for partial summary judgment, the City argued the expansion of the outdoor storage and sales operations A-1 conducted on Lot 6 to Lot 5 was a prohibited use under LR zoning regulations, and A-1 could not establish nonconforming use status for its operations. The City relied on aerial photographs taken in 2001 to support its position that prior to the adoption of the current 2001 zoning ordinance, the Andertons' business was confined to Lot 6.

The Andertons responded arguing the only witnesses with actual knowledge of the use of Lot 5 testified fill dirt was stored for sale on Lot 5 and such dirt would not show up on aerial photographs. Doyle Anderton stated in his affidavit the "use of the Property since 2000 has been for the sale of landscaping or building materials." He further explained fill dirt for sale was located on Lot 5 and the "for sale fill dirt is not visible on the aerials introduced with the Motion for Summary Judgment."

Lynch also confirmed the aerial photographs did not clearly show the fill dirt that was for sale on Lot 5. He stated, "All of these materials located on the Property were inventory intended for immediate sale to retail customers and wholesale contractors." The City did not produce any affidavit or deposition testimony by anyone with personal knowledge to refute the Andertons' evidence that Lot 5 has been in continuous use for the landscaping business since 1985. Moreover, the 2001 aerial photographs show portions of storage bins on Lot 6 cross the property line onto Lot 5. Thus, the Andertons have raised a fact issue as to the actual land use of Lot 5 prior to the 2001 amendments to the city ordinance.

In reaching this conclusion, we disagree with the City's argument that the Andertons have failed to create a fact issue based on their intent to sell fill dirt stored on Lot 5. The City contends the nonconforming use regulations in its 2001-64 zoning ordinance make no mention of

"intent" for determining nonconforming use status. Rather, the City asserts nonconforming use status can only be ascertained by facts evidencing the actual use of the property prior to amendment of the ordinance. While we agree Doyle stated in his affidavit the material located on Lot 5 was "intended for immediate sale to retail customers and contractors," the City ignores his other statements in which he clearly stated Lot 5 has been used continually for the sale of landscaping and building materials, and "Fill dirt was located on Lot 5." These statements do more than indicate an intent to use Lot 5 for the storage of fill dirt but rather raise a fact issue as to the actual use of Lot 5.[2]

Despite the fact issue as to the use of Lot 5 for the storage of fill dirt, the City argues, "Assuming that the affidavits of Lynch and Anderton raise a fact question regarding Appellants' actual use of Lot 5, such facts are immaterial, because storage of fill dirt on [L]ot 5 was illegal from 1985 until the enactment of the 2001 Zoning Ordinance."

According to Rod Tyler, the City's Planning Director, "sand and gravel storage" should be interpreted to encompass the outdoor storage of other bulk materials, such as dirt and stone. Thus, the City asserts the Andertons' business was an illegal sand and gravel business. Under the 1985 zoning ordinance, "sand or gravel" was "specifically deleted and repealed" as an allowed use in a C district. The Andertons, however, produced evidence through affidavit and deposition testimony creating a fact issue as to whether they were operating a landscape or building material sales business.

Doyle stated in his affidavit the business sold fill dirt, rock, sand, gravel, flagstone, plants, grass, and firewood on the property, and all such materials were intended for immediate sale to retail customers and contractors. He further stated the materials are similar to those sold

---

[2] The Andertons also argue their leasing of Lots 5 and 6 from Lynch creates a fact issue as to the nonconforming use status of Lot 5. They rely on *Board of Adjustments of City of San Antonio v. Wende*, 92 S.W.3d 424 (Tex. 2002) to support their position. However, having concluded a fact issue already exists, we need not determine if this argument presents another fact issue. TEX. R. APP. P. 47.1.

by Lynch prior to 2000. He specified the use of Lots 5 and 6 were for the sale of landscaping and building material and have been continually used for such purposes. He further explained the materials stored on Lot 5 were inventory for sale to the public. The term "gravel and sand" storage refers to construction gravel and sand that is stored for a period of time by a contractor until it can be used in a subsequent construction job. He noted A-1 stored sand and gravel as "just a part of its inventory for sale to the general public."

Lynch agreed all of the materials located on the property were inventory intended for immediate sale to retail customers and wholesale contractors. He further stated he would describe the business as a "landscaping business" or as selling "building materials." He disagreed with the City's description of it as a sand and gravel storage business. He explained that his 1985 building permit for the property stating use as "sand and gravel sales" was not intended to limit or describe the use of all the material as part of the business operation. Sand and gravel were only two types of the building materials sold by his business.

Stacey Graves, the City's code enforcement supervisor testified in her deposition that she observed sand, gravel, and rock stored on Lot 5. However, when asked if the inventory was stored as well as for sale, she stated, "I don't know if he sells those items or just stores them." Tyler stated in his deposition the closest listed use for the property was "building material sales," and he admitted "building material sales" was an allowed use in a commercial district under the 1985 ordinance. Thus, we conclude the evidence the Andertons presented creates a disputed fact issue as to the definition of the business, which affects whether the Andertons' use of Lot 5 achieved lawful nonconforming use status before the 2001 zoning ordinance took effect.

We acknowledge the City briefly argues any purported nonconforming use of Lot 5 for the Andertons' business prior to 2001 was abandoned. However, the City did not raise abandonment as a ground for summary judgment in its motion. In one sentence, under its

–9–

"SUMMARY OF ARGUMENT," the City mentions abandonment. The City failed to include this argument under its "GROUNDS FOR SUMMARY JUDGMENT" or in its "ARGUMENTS AND AUTHORITIES" sections. Summary judgments may only be granted upon grounds expressly asserted in the summary judgment motion. TEX. R. CIV. P. 166a(c); *G&H Towing Co. v. Magee*, 347 S.W.3d 293, 297 (Tex. 2011). Thus, because the trial court could not grant summary judgment upon this ground, as it was not expressly asserted, we will not address the City's abandonment argument on appeal. TEX. R. APP. P. 47.1.

Finally, the City argues the lawful use of Lot 5 was limited to mini-warehouse storage prior to enactment of the 2001 zoning ordinance; therefore, any other use of Lot 5 was illegal from the outset, thus negating any lawful nonconforming use status. The Andertons disagree with the City's interpretation of the conditional use for mini-warehouse storage and contend the special use zoning is irrelevant because, under these facts, the zoning expired no later than 1986.

Courts use the same rules used to construe statutes to construe municipal ordinances. *Wende*, 92 S.W.3d at 430. Thus, our objective in construing the 1985 ordinance is to discern the City's intent. *Id.* In making this determination, we look first to the plain meaning of the words of the provisions and are mindful that we should not assign meaning to a provision that would be inconsistent with other provisions. *Id.*

Ordinance No. 85-802 changed zoning from C to "special use for mini warehouse storage." Section 3 of the ordinance provided, "This Special Use Zoning Classification shall be applicable as long as the property is used for Mini Warehouse Storage, and in the event such use discontinues, the zoning shall revert to Commercial." Article XIII of Ordinance No. 85-802 relating to special uses of mini-warehouses states, "All special use permits terminate when the special use ceases or after one (1) year from approval if meaningful construction is not under way."

–10–

It is undisputed Lot 5 was never used for mini-warehouse storage. The City focuses on the word "discontinue" in section 3 to support its argument that because Lot 5 was never used for mini-warehouse storage in the first place, the use could not be discontinued; therefore, the reversionary language back to commercial never applied. The City claims, "The ordinance is silent on the effect of a failure to commence construction of the use within a time certain." We disagree with the City's interpretation of the ordinance.

First, the plain language of the ordinance does in fact contemplate a situation in which a mini-warehouse was never built. Section 3 specifically states special use zoning applies "as long as the property is used for Mini Warehouse Storage." If property is never used for mini-warehouse storage, the special use zoning never applies, and the zoning reverts back to commercial as expressly stated in section 3.

We agree with the Andertons the legislative intent for this interpretation is furthered by the language in Article XIII, which provides that all special use permits terminate after one year from approval if meaningful construction is not under way. While we agree Article XIII does not include the reversionary language present in section 3, such language is unnecessary. If construction is not under way within a year, then the property is clearly not being used for mini-warehouse storage. When the property is not being used for mini-warehouse storage, the special use permit terminates. It follows then that the termination of the special use permit results in a discontinued use of the property. When property is not being used for mini-warehouse storage or the use is discontinued, it loses its special use status and reverts back to commercial. Thus, we agree with the Andertons that reading these two sections of the ordinance together, the mini warehouse zoning does not apply. Accordingly, the trial court could not rely on this ground to support the City's summary judgment as to the alleged nonconforming use status of Lot 5.

Having addressed both parties arguments, we conclude the Andertons presented evidence of a disputed fact issue at to the use of Lot 5. As such, the trial court erred in granting summary judgment and concluding the Andertons have "no non-conforming use rights in Lot 5 of the Subject Property." We sustain appellants' first issue.

**Inverse Condemnation**

In their second issue the Andertons argue their inverse condemnation counterclaim is ripe for review; therefore, the trial court erred by granting summary judgment as to that claim. The Andertons' inverse condemnation counterclaim asserts the 2001 zoning change has resulted in the City attempting to prevent them from using Lot 5 for its intended use and has substantially devalued the property and interfered with their reasonable investment-backed expectations that they could continue their business on the property. The City responds the Andertons' claim is premature, as they have not availed themselves of relief measures available under the zoning ordinance, which would have allowed the City to reach a final decision regarding proposed uses of Lot 5.

An inverse condemnation claim is ripe for review if it has legally matured, meaning that a governmental entity has made a final determination regarding the type of development legally permitted on the subject property. *City of Dallas v. Chicory Court Simpson Stuart, L.P.*, 271 S.W.3d 412, 417 (Tex. App.—Dallas 2008, pet. denied). Therefore, ripeness requires action by both the landowner and the governmental entity. *Id.*

The Andertons argue the very filing of this lawsuit and seeking a declaratory judgment as to whether the Andertons' use of Lot 5 "for purposes of expansion of the non-conforming business on Lot 6 are unlawful expansions of a non-conforming use, prohibited by section 2.5 of the City's Zoning Ordinace" establishes the City's final decision as to the legal use of Lot 5. The City responds this Court has held the filing of a lawsuit is not a statement of a City's final

position and does not make an issue ripe for review. *See TCI West End, Inc. v. City of Dallas*, 274 S.W.3d 913 (Tex. App.—Dallas 2008, no pet.).

In *TCI*, the city filed suit against TCI under chapters 54 and 211 of the local government code after TCI ordered the demolition of property despite the revocation of the demolition permit. *Id*. at 915. The City of Dallas Landmark Commission filed a petition in intervention asserting a cause of action under local government code section 315.006. *Id*. TCI later filed counterclaims against the city and the commission alleging inverse condemnation. *Id*. The city and commission then filed pleas to the jurisdiction claiming, among other things, that TCI failed to exhaust the required administrative remedies and the claims were not ripe. *Id*. The trial court granted the pleas to the jurisdiction and dismissed the case. *Id*. at 916. In addressing TCI's takings claim against the commission, we determined that merely intervening in a lawsuit, which the commission had a statutory right to do under section 315.006, could not be construed as an intentional governmental taking. *Id*. at 918 ("Under these facts, we refuse to conclude the filing of a lawsuit constitutes a taking."). In addressing TCI's inverse condemnation claim against the city, we again noted the filing of a lawsuit "does not in and of itself" result in a taking; however, we further noted the city code provided certain procedures for a party to challenge the revocation of a demolition permit, which TCI failed to do. *Id*. at 921. Without taking advantage of the administrative procedures for reviewing the permit revocation, there was no final decision by the city; therefore, TCI's inverse condemnation claim was not ripe. *Id*.

Here, the Andertons and the City are not before us from a trial court's ruling on a plea to the jurisdiction, but rather because of the trial court granting summary judgment from a declaratory judgment action filed by the City. This is a key distinction. A plea to the jurisdiction is a dilatory plea in which the purpose is to "defeat a cause of action without regard to whether the claims asserted have merit." *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex.

–13–

2000); *Ollie v. Plano Indep. Sch. Dist.*, 383 S.W.3d 783, 789 (Tex. App.—Dallas 2012, pet. denied) (*cert. den'd.* 133 S.Ct. 2812 (2013)). It involves a trial court's subject matter jurisdiction. The Declaratory Judgment Act, however, does not create or augment a trial court's subject matter jurisdiction—it is merely a procedural device for deciding cases already within a trial court's jurisdiction. *Transp. Ins. Co. v. WH Cleaners, Inc*., 372 S.W.3d 223, 227 (Tex. App.—Dallas 2012, no pet.). Furthermore, the act is a remedial statute, the purpose of which is "to settle and afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations; . . . ." TEX. CIV. PRAC. & REM. CODE ANN. § 37.002(b) (West 2008). Thus, under these facts, we conclude the filing of a declaratory judgment action in the trial court resulted in the City presenting its final decision to the trial court regarding the Andertons alleged violation of ordinance No. 2001-64. Therefore, because the procedural postures of *TCI* and the present case are distinguishable, we do not find the City's reliance on *TCI* persuasive.

Besides the procedural postures of the two cases, another distinction between *TCI* and the present facts is the procedures provided under the Dallas city code for TCI to appeal the permit revocation, thereby exhausting its administrative remedies, which TCI failed to do. As explained below, the provisions relied on by the City for the Andertons to allegedly exhaust their administrative remedies are inapplicable. In fact, such efforts would be futile.

The City argues the Andertons' claims are not ripe because they failed to request a special use permit under Article 5.4.9, and they failed to request a special exception from the Zoning Board of Adjustment under article 2.2.5.F.3 to allow the expansion of a nonconforming use beyond the area occupied at the time the LR regulations took effect. We address each argument in turn.

Article 5.4.9 provides that in the LR district, outdoor sales, storage, and display shall not exceed five percent of the area of the principal building (in this case, a 448 square-foot office

–14–

building located on Lot 6), which would apply to and limit the expansion of activities onto Lot 5. The provision further states, "Additional outdoor sales, storage or display area may be authorized on a case-by-case basis through the Conditional Use Permit (CUP) process (see section 3.20)." Although the City claims the Andertons could have applied for a CUP with the City for additional outdoor storage space, the City overlooks the fact that application for a CUP is appropriate when an owner wishes to expand outdoor storage of a legal conforming use, which is not the present case. The Andertons are seeking to continue using Lot 5 for a legal nonconforming use. Article 5.4.9 does not address this situation and therefore is inapplicable to the present facts.

Article 2.2.5.F.3 allows the Zoning Board of Adjustments to change property from one nonconforming use to another "only upon a finding that the failure to grant the special exception deprives the property owner of substantially all use or economic value of the land." The City stated in its motion for partial summary judgment that "A-1 can still make economically viable use of its Property by establishing an *authorized* use of the premises of Lot 5." [Emphasis in original.] Thus, the City has already determined terminating or limiting the Andertons' nonconforming use would not deprive Lot 5 of all value. As such, it would be futile for the Andertons to apply for a special exception under Article 2.2.5.F.3.

Furthermore, the City overlooks the fact that in 2008, the Andertons submitted a request from the City to change the zoning classifications of Lots 5, 6, and 7 from LR to C. During the January 13, 2009 meeting, the mayor pro tem acknowledged Lot 6 was "shown as legally existing non-conforming." However, the City Council subsequently denied the Andertons' request to change the zoning. As courts have repeatedly acknowledged, futile re-applications or variance requests are not required for a property owner's inverse condemnation claim to ripen. *Mayhew*, 964 S.W.2d at 929. Thus, the Andertons submitted a request, which the City denied.

–15–

The articles the City relies on to provide possible remedies do not apply. And the City filed a lawsuit seeking declaratory judgment. Accordingly, we conclude the Andertons' inverse condemnation claim is ripe, and the trial court erred in dismissing it. We sustain the Andertons' second issue.

**Texas Local Government Code Chapter 245 Rights**

In their third issue, the Andertons contend the trial court erred by dismissing their counterclaim under chapter 245 of the Texas Local Government Code because they had vested property rights in Lot 5. The City responds chapter 245 does not apply. We agree with the City.

Chapter 245 of the local government code creates a system by which property developers can rely on the land-use regulations in effect at the time "the original application for [a] permit is filed" involving a project. TEX. LOC. GOV'T CODE ANN. § 245.002(a) (West 2005); *Save Our Springs Alliance v. City of Austin*, 149 S.W.3d 674, 681 (Tex. App.—Austin 2004, no pet.). At the same time, because the "laws, rules, regulations, or ordinances of a regulatory agency" may change and those changes may "enhance or protect the project," it allows a permit holder to take advantage of those changes without forfeiting any of its chapter 245 rights. TEX. LOC. GOV'T CODE ANN. § 245.002(d).

Chapter 245 defines "project" as "an endeavor over which a regulatory agency exerts its jurisdiction and for which one or more permits are required to initiate, continue, or complete the endeavor." *Id*. § 245.001(3). Chapter 245 does not define "endeavor"; however, an attorney general's opinion discussing chapter 245 stated "endeavor" is commonly defined as "the action of endeavouring; effort, or pains, directed to attain an object." Tex. Att'y Gen. Op. No. JC-0425 (2001) (quoting V Oxford English Dictionary 226 (2d ed. 1989)); *see also* BLACK'S LAW DICTIONARY 547 (7th ed. 1999) (defining "endeavor" as "a systematic or continuous effort to

attain some goal" or "to exert physical or intellectual strength toward the attainment of an object or goal").

Here, the Andertons argue, among other things, that their landscaping business was an ongoing project encompassing both Lots 5 and 6. Thus, they contend the City is prohibited from preventing them from using both lots in accordance with the rules in effect when the original permit was issued in 1985. Thus, as the Andertons conceded in oral argument,[3] to determine if chapter 245 applies, we must determine whether operation of an ongoing business is a "project." We conclude it is not.

When Lynch originally applied for a building permit in 1985, he wanted to build a 448 square-foot structure that would be used as an office for his business. The permit specifically lists the location as "Lot No. 6" and use as "sand gravel sales." It is undisputed the building was constructed. Thus, any chapter 245 rights would be attached only to the 1985 permit for construction of the office.

Cases discussing chapter 245 do not contemplate a situation, as raised here, of a party relying on a permit for a development project to expand the party's ongoing business onto another piece of property not encompassed by the original permit. In fact, the cases do not involve business activities at all, but focus on the development of property as authorized under a permit.

For example, in *Hartsell v. Town of Talty*, 130 S.W.3d 325 (Tex. App.—Dallas 2004, pet. denied), the town argued Hartsell violated a city ordinance by constructing single-family residences without first applying for building permits from the town. The town argued a preliminary plat application was a "project" separate and distinct from the construction of an

---

[3] When asked if to determine whether chapter 245 applies, we must determine whether the ongoing operation of a business is a "project," appellants' counsel answered, "I think that's correct."

individual residence within the subdivision, which would be a subdivision "project." *Id*. at 327–28. Construing the plain language of chapter 245, we concluded a "project" encompasses the entire development process from preliminary plat to the construction of a structure within the subdivision, which does not change unless the scope of the "project" changes. *Id*.; *see also BMTP Holdings, L.P. v. City of Lorena*, 359 S.W.3d 239, 245 (Tex. App.—Waco 2011) (interpreting chapter 245 to include the entire development process and not discrete components), *aff'd*, 409 S.W.3d 634 (Tex. 2013). Thus, *Hartsell* focuses on a "project" in terms of developing land and constructing homes, not the ongoing operation of a business.

In *City of San Antonio v. En Seguido, Ltd*., 227 S.W.3d 237 (Tex. App.—San Antonio 2007, no pet.), the court concluded rights are vested in a particular project and not in the property on which the project is undertaken. In that case, the issue was whether the building project En Seguido sought to pursue was a change from the project envisioned in the original 1971 subdivision plat application. *Id*. at 243. The court of appeals concluded fact issues existed regarding whether the purchase of the 27-acre single-lot tract, which En Seguido wanted to subdivide into 154 separate lots, was a "project" under the original application. Thus, the "project" involved the development of the land and not some later ongoing operation of a business. While we agree with the Andertons' citation of this case for the proposition "a permit can be decades old and still be entitled to vested rights protection," it does not support its argument that the ongoing operation of business is a "project" as defined under chapter 245.

Lastly, the Andertons rely on *Harper Park Two, LP v. City of Austin*, 359 S.W.3d 247 (Tex. App.—Austin 2011, pet. denied) for the proposition that "labels on a permit do not restrict the scope of a protected permit"; therefore, they are not limited by their designation as the "project's" location to Lot 6. While we agree with this statement of law, the facts in *Harper Park Two* are distinguishable. In that case, a property owner applied for a permit in which the

project on one part of a larger subdivision was identified as an "office." *Id.* at 251. Later, the property owner wanted to build a hotel instead. *Id.* Thus, the dispute centered around the meaning of "project." *Id.* at 255. In construing chapter 245, the court concluded the relevant "project" was the subdivision as a whole, as reflected in the preliminary plat application, and not the six-acre lot designated as "office" viewed in isolation. *Id.* at 256. At the time of the permit application, the property at issue was categorized as mixed-use "Condo, Office, Commercial." *Id.* As such, the court concluded the city had no authority to limit the property owner's development on the property so long as it fell under the category of mixed-use "Condo, Office, Commercial" at the time of the original application. *Id.* (" . . . what matters under chapter 245, . . . , is that the 1985 preliminary plan application, viewed in the context of the applicable land-use regulations at the time, gave notice to the City that the Harper Park Two subdivision would be a mixed use 'commercial' development subject to the corresponding requirements of the Barton Creek Watershed ordinances").

Here, the Andertons want to expand *Harper Park Two* to mean a property owner should not be bound by their "label" of a specific lot (Lot 6) to develop the property when their intent was to use both lots for their business. We decline to interpret *Harper Park Two* so broadly. Moreover, the parties in *Harper Park Two* were fighting over the development of a type of building on a specific piece of property. They were not, as here, arguing that a business has a vested property right to use a different lot than the one listed on the permit application. Accordingly, *Harper Park Two* does not support the Andertons' argument that they have vested property rights under chapter 245.

As previously stated, the intent of chapter 245 is to prohibit land-use regulators from changing the rules governing *development* projects "in the middle of the game," thereby "insulating already-underway developments and related investment from the vicissitudes and

–19–

uncertainties of regulatory decision making and all that may influence it." [Emphasis added.] Therefore, construing case law and the statutory definition of "project" within the intent of chapter 245, we conclude the ongoing operation of a business is not a "project" creating any vested property rights. While the Andertons have argued fact issues exist as to whether the 1985 permit applied to Lot 5 and whether the "project" was complete, neither of these arguments raise a fact issue to overcome our conclusion that the operation of a business is not a "project" as a matter of law. *See Hartsell*, 130 S.W.3d at 327 (noting construction of chapter 245 is a question of law). Having reached this conclusion, we need not address the City's arguments that exemptions under section 245.004 apply. *See* TEX. LOC. GOV'T CODE ANN. § 245.004; TEX. R. APP. P. 47.1. Accordingly, the trial court did not err in dismissing the Andertons' chapter 245 counterclaim. We overrule the Andertons' third issue.

### Attorneys' Fees

In their final issue, the Andertons argue the trial court erred by awarding attorneys' fees to the City under Texas Civil Practice and Remedies Code section 37.009. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (West 2008) (trial court may award attorney's fees in a declaratory judgment action). The City responds the fee award should stand because the Andertons ignore the fact they stipulated to entry of judgment against them on declaratory and injunctive relief in favor of the City as to Lots 6 and 7 and have not challenged these rulings on appeal. Further, the City argues it is undisputed the Andertons' do not dispute the amount of the attorneys' fees awarded.[4] Therefore, the City alleges its fee award should stand based on its prevailing party status as to Lots 6 and 7. We disagree with the City.

---

[4] The Andertons stipulated the amount of fees awarded in the judgment were reasonable and necessary, but they did not agree that the fees should be awarded.

A trial court "may award costs and reasonable attorney's fees as are equitable and just" in a declaratory judgment proceeding. *Id.* The grant or denial of attorneys' fees in a declaratory judgment action lies within the discretion of the trial court, and its judgment will not be reversed on appeal absent a clear showing of abuse of discretion. *Hartsell*, 130 S.W.3d at 329.

Here, the Andertons argue the fees should not have been awarded because the City should not have prevailed on its declaratory judgment regarding the use of Lot 5 (the Andertons' first issue). While we agree the trial court acted within its discretion awarding the City its fees as the prevailing party in regards to the declaratory judgments involving Lots 6 and 7, we disagree that it then follows the total $120,000 awarded is still just and equitable in light of this Court ruling in favor of the Andertons as to issue one. Having reversed the trial court's summary judgment order granting declaratory judgment for the City, the proper procedural relief is to likewise reverse the attorneys' fee award and remand for reconsideration of fees in light of this opinion. *Id.*; *see also Double Diamond, Inc. v. Saturn*, 339 S.W.3d 337, 347 (Tex. App.—Dallas 2011, pet. denied). Accordingly, we sustain the Andertons' fourth issue.

## Conclusion

Having determined a fact issue exists regarding the nonconforming use status of Lot 5, we reverse the trial court's judgment to the extent it ordered "Defendants have no nonconforming use right in Lot 5 of the Subject Property. Defendants are enjoined from using any part of Lot 5 for Defendants' business being conducted on Lot 6;" and remand for further proceedings.

Having concluded the Andertons' inverse condemnation claim is ripe for review, we reverse the trial court's judgment to the extent it ordered, "Defendants' inverse condemnation claim is not ripe for judicial review and hereby is DISMISSED with prejudice" and remand for further proceedings.

–21–

We reverse the trial court's award of attorneys' fees to the City and remand the issue for reconsideration in light of our opinion.

In all other respects, the final judgment is affirmed.

120969F.P05

/David L. Bridges/

DAVID L. BRIDGES
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

PATSY B. ANDERTON AND DOYLE
ANDERTON, INDIVIDUALLY AND
D/B/A A-1 GRASS SAND AND STONE,
Appellants

No. 05-12-00969-CV    V.

CITY OF CEDAR HILL, TEXAS, Appellee

On Appeal from the 14th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. 09-12187.
Opinion delivered by Justice Bridges.
Justices Fillmore and Lewis participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED** in part and **REVERSED** in part.

We **REVERSE** the trial court's judgment to the extent it ordered "Defendants have no non-conforming use rights in Lot 5 of the Subject Property. Defendants are enjoined from using any part of Lot 5 for Defendants' business being conducted on Lot 6" and **REMAND** for further proceedings consistent with this opinion.

We **REVERSE** the trial court's judgment to the extent it ordered "Defendants' inverse condemnation claim is not ripe for judicial review and hereby is DISMISSED with prejudice" and **REMAND** for further proceedings consistent with this opinion.

We **REVERSE** the trial court's award of attorneys' fees to the City and **REMAND** for further consideration in light of this opinion.

In all other respects, the trial court's judgment is **AFFIRMED**.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered August 22, 2014

–23–