**Opinion on rehearing issued December 8, 2016**



In The

# Court of Appeals

For The

## First District of Texas

————————————

### NO. 01-15-00266-CV

————————————

**UNOCAL PIPELINE COMPANY, Appellant**

**V.**

**BP PIPELINES (ALASKA) INC., CONOCO PHILLIPS TRANSPORTATION ALASKA, INC., AND EXXONMOBIL PIPELINE CO., Appellees**

---

**On Appeal from the 165th District Court
Harris County, Texas
Trial Court Case No. 2013-06244A**

---

### OPINION ON REHEARING

Appellant, Unocal Pipeline Company ("Unocal"), filed a suit for declaratory judgment seeking resolution of controversies arising from its withdrawal from the Trans-Alaska Pipeline System and the accompanying Trans-Alaska Pipeline

System Agreement. Unocal and the appellees, BP Pipelines (Alaska) Inc., Conoco Phillips Transportation Alaska, Inc., and ExxonMobil Pipeline Co. ("the Remaining Owners"), filed cross-motions for summary judgment regarding interpretation of the transfer provisions in the agreement. On appeal, Unocal argues that the trial court erred in its construction of the transfer provisions in the agreement and in concluding that other portions of the dispute were not ripe.

This Court issued its May 17, 2016 opinion and judgment, in which we reversed the trial court's judgment, rendered judgment in part declaring that certain dismantlement, removal, and restoration requirements ("DR&R obligations") set out in the parties' agreement are part of a withdrawing owner's interest in the Trans-Alaska Pipeline System ("TAPS") that are transferred pursuant to the parties' agreement, and we remanded Unocal's claim seeking declaratory judgment construing the "shall pay" provision of that agreement for further proceedings consistent with the May 17, 2016 opinion. The Remaining Owners moved for rehearing on July 1, 2016, arguing that we erred in holding that the DR&R obligations transferred to the Remaining Owners upon Unocal's withdrawal from TAPS and that we erred in determining that the net salvage value calculation ("NSV") constitutes an adequate remedy to protect the interests of the Remaining Owners.

We grant the motion for rehearing, withdraw our May 17, 2016 opinion and judgment, and issue this opinion and judgment in their stead in order to clarify our interpretation of the various agreements governing TAPS's ownership and operation. Our disposition remains unchanged: we reverse the judgment of the trial court, render in part, and remand in part.

## Background

In 1970, a group of oil companies including the Remaining Owners and Unocal or their corporate predecessors entered into a series of agreements for the purpose of constructing, operating, and maintaining the Trans-Alaska Pipeline System, or TAPS, for bringing oil from the Prudhoe Bay area of Alaska to the City of Valdez, Alaska. The parties first procured a series of lease agreements with the United States, the State of Alaska, and private individuals to secure easements and rights-of-way for constructing TAPS. The parties agree that, specifically relevant to the present dispute, the right-of-way agreement with the United States government provided for certain DR&R obligations, which require the TAPS owners to dismantle and remove pipeline equipment and restore the affected land upon the conclusion of the TAPS operations:

> [U]pon the completion of use of all, or a very substantial part, of the Right-of-Way . . . Permittees shall promptly remove all improvements and equipment, except as otherwise approved in writing by the Authorized Officer, and shall restore the land to a condition that is satisfactory to the Authorized Officer or at the option of Permittees pay the cost of such removal and restoration.

3

Additionally, the leases, including the Trans-Alaska Pipeline Agreement itself, generally contain obligations for dismantling and removing the pipeline and restoring the land to some extent.

The federal right-of-way lease also contains provisions governing transfers of the rights and obligations under the right-of-way. Section 22 of that lease provides that the "Permittees," including Unocal, cannot transfer any of their interests under the lease without obtaining prior written consent from the government and that, to obtain such consent, the transferee must demonstrate that it is capable of performing all of the liabilities and obligations of the transferor relating to the interest to be transferred. Section 22.G provides:

> A Permittee seeking to be divested in whole or in part of its right, title, and interest in and to the Right-of-Way and this Agreement in connection with a Transfer shall be released from its liabilities and obligations (accrued, contingent, or otherwise) to the United States under this Agreement to the extent and limit that the Transferee assumes unconditionally the performance and observance of each such liability and obligation, *provided:*
>
> > (1)    All provisions of this Agreement with respect to the approval or disapproval of the Transfer have been fully complied with to the satisfaction of the Secretary;
> >
> > (2)    The Secretary has consented in writing to the Transfer; and
> >
> > (3)    Thereafter the Transfer and the attendant assumption agreement, if any, are in fact duly consummated on the basis of the documents previously presented to the Secretary for his review, and the Secretary is so notified in writing by the parties to the Transfer.

Subsequently, in 1970, the parties entered into an agreement governing the design, construction, ownership, maintenance, and expansion of TAPS (the "TAPS Agreement"). Relevant to the dispute here, Article III of the TAPS Agreement addressed the ownership of TAPS. Section 3.1 provides that

> TAPS (including but not limited to all fee titles, easements, leases, permits, rights-of-way and other interest in land) shall be owned by the Parties hereto with each Party's undivided interest in TAPS . . . being equal to its percentage of ownership ("Percentage of Ownership") in TAPS as set forth [in this section].

Section 3.4 sets out ownership of Record Title to certain land rights, providing,

> All land rights, including but not limited to fee titles, easements, leases, permits, rights-of-way and other interests in land, required for the design, construction, operation and maintenance of TAPS shall be conveyed to or acquired for the Parties. . . . All instruments and conveyances evidencing such land rights or the trust instruments relating thereto shall indicate each Party's respective interest therein which interest will be the Party's Percentage of Ownership as it appears in [this section].

> Article VII of the TAPS Agreement governs transfers of interest in TAPS.

Section 7.2 provides for a preferential right to purchase, stating,

> An OWNER may sell, transfer or otherwise dispose of all or any part of its undivided interest in TAPS but only by a sale for cash and only after offering such interest to all other OWNERS who are hereby granted the preferential right to purchase such interest (but not a lesser or different interest) on the same terms offered by or to any bona fide, prospective purchaser, who is ready, willing and able to purchase same.

It then sets out the mechanism for effectuating the preferential right of purchase. It provides, in relevant part:

If more than one OWNER desires to join in the purchase of such interest then, unless otherwise agreed by the purchasing OWNERS, all such OWNERS shall purchase the same proportionately in the ratio that their Percentage of Ownership in TAPS prior to said purchase bear to each other.

Section 7.8 governs transfers to successors and assigns. It provides, in relevant part:

Any transfer of an undivided interest in TAPS shall be subject to this Agreement and shall require the transferee to assume all of the obligations of an "OWNER" and a Party under this Agreement and all commitments made pursuant hereto and its proportionate part of all costs and expenses of TAPS. Any such transferee shall be deemed to be an OWNER and a Party under this Agreement upon (i) the execution by such transferee of a Ratification Agreement confirming and adopting this Agreement and (ii) the execution of an Enabling Agreement by a Parent Corporation, if any, of such transferee.

Article VIII of the TAPS Agreement sets out the term of the Agreement, including the discontinuance of operation by a party. It states that the original term was for thirty years, to be followed by five-year renewal terms. The original term began July 31, 1977, and ran until July 31, 2007.

Section 8.1 states, "If, at the end of any Agreement Term, less than two Parties desire to continue operations hereunder, this Agreement shall terminate."

Section 8.2 provides for the "Discontinuance of Operations by One or More Parties," and its provisions apply "[i]f at the expiration of any Agreement Term, any one or more of the Parties hereto desire to discontinue operations hereunder

6

and any two Parties hereto desire to continue operations hereunder[.]" Section

8.2(b) sets out the notice requirements. Section 8.2(c) provides:

> Upon the completion of all transfers and undivided interests in TAPS, the Parties desiring to continue operations hereunder shall formally amend Table I in Section 3.1 of this Agreement [setting out percentages of ownership interests] to reflect the Percentages of Ownership in TAPS each has acquired from the Party or Parties desiring to discontinue operations.

Section 8.2(d), entitled "Rights of Parties—Determination of Salvage

Value" provides:

> The Parties desiring to continue operations hereunder may do so following the applicable Agreement Term, but the Party or Parties who have elected not to continue operation hereunder shall not be charged with any part of the expenses, costs and liabilities thereafter incurred in the operation, maintenance and repair of TAPS except as provided in subsection (f) hereof, and such Party or Parties discontinuing operations hereunder shall not be entitled to accept any further tenders of shipment. All Parties owning an interest in TAPS shall endeavor mutually to agree within sixty (60) days after termination of the applicable Agreement Term, upon the reasonable net salvage value of the TAPS properties, including transferable interest in land, material, equipment and all other items of value (herein called "Net Salvage Value"), and if such Parties are unable to mutually agree upon such salvage value within the time fixed, then the matter shall be submitted to arbitration, using the procedure set forth in Section 11.1 hereof.

Section 11.1, entitled "Arbitration Procedure," applies whenever "[a]

determination of Net Salvage Value" pursuant to Subsection (d) of Section 8.2 is to

be made. In that event, "within ten (10) days after it has been determined that the

Parties cannot mutually agree upon the Net Salvage Value, the Party or Parties

desiring to discontinue operations shall select one arbitrator and the Parties desiring to continue operations hereunder shall select another arbitrator." Those arbitrators then select a third. Section 11.1 further provides:

> It shall be the duty of the arbitrators promptly to arrive at a decision as to Net Salvage Value or Salable Value, as the case may be, and the decision of any two of said arbitrators in writing shall be binding upon all Parties hereto.

> Section 8.2(e), entitled "Conveyance to Parties Desiring to Continue

Operations," provides:

> Upon establishing the Net Salvage Value as above provided, the Parties desiring to continue operations shall pay to the Party or Parties desiring to discontinue operations its or their proper proportion of such Net Salvage Value (such proper proportion being determined as to each Party desiring to discontinue operations hereunder by multiplying such Party's Percentage of Ownership times the Net Salvage Value) and upon receipt of such payment, such Party or Parties shall convey to the purchasing Parties all of its or their interest in TAPS and all rights in connection therewith. Such conveyance shall contain a special warranty of title, shall be made subject to this Agreement and shall require the transferees to assume the obligations accruing under this Agreement subsequent to the last day of the Agreement Term during which such Party or Parties made the election to discontinue operations hereunder as to the interest covered thereby, each transferee severally assuming such obligations insofar as they relate to the interest acquired by it. . . .

Section 8.2(f) provides for a sale to a third party in lieu of acceptance of the Net Salvage Value.

Section 8.3 provides for the disposition of properties upon termination of the TAPS Agreement. It provides, in relevant part, "Upon termination of this

8

Agreement, TAPS shall be either continued in operation by the Parties under a new agreement, sold in place for continued operation or salvage by others, or salvaged by the Parties as they may agree unanimously."

The parties also entered into an operating agreement in 1977 which expressly integrated the TAPS Agreement, stating "This Operating Agreement and the TAPS Agreement constitute the entire agreement between Owners as to the design, construction, ownership, expansion, operation and maintenance of the System." ("TAPS Operating Agreement"). Section 13 of the TAPS Operating Agreement provides:

> Successors and Assigns. Owners agree with each other that so long as this Operating Agreement remains in force and effect, all sales or other transfers or assignments of interests in the System must be made pursuant to the provisions of the TAPS Agreement and shall be made subject to this Operating Agreement. All obligations and liabilities of the selling Owner shall be assumed by the purchaser in the same manner as obligations and liabilities under the TAPS Agreement. Such purchaser shall be required to execute a ratification of this Operating Agreement and shall thereafter be one of the Owners hereunder for all purposes contemplated by this Operating Agreement. The rights, duties and responsibilities of Operator under this Operating Agreement shall not be assignable without the consent of all Owners except as herein expressly authorized.

Pursuant to section 8.1 of the TAPS Agreement, Unocal gave notice of its intent to withdraw from TAPS at the end of the Agreement Term ending July 31, 2012. After it issued its withdrawal notice, the Remaining Owners elected to continue without Unocal. However, Unocal was unable to complete its withdrawal

9

due to disputes between it and the Remaining Owners regarding key aspects of the TAPS Agreement. These included the inability to agree upon the Net Salvage Value ("NSV") of Unocal's undivided interest in TAPS; a dispute over the intent of the TAPS Agreement with respect to whether the DR&R obligations in the rights-of-way agreements subject to the TAPS Agreement transfer to the Remaining Owners or remain with the withdrawing owner; and a dispute over whether Unocal is required to pay the Remaining Owners its portion of the NSV if the value is negative.

To receive a release from the United States and Alaska for its proportionate share of the DR&R obligations outlined in the rights-of-way agreements, Unocal filed a declaratory judgment suit seeking a declaration that when it ceases operations and reverts its ownership to the Remaining Owners, it also transfers the DR&R obligations. Unocal also sought a declaratory judgment regarding the construction of section 8.2(e) of the TAPS Agreement, which it calls the "shall pay" provision. It sought a declaration that section 8.2(e) provides for the Remaining Owners to pay it in the event of a positive NSV, but no payment is required by either party in the event of a negative NSV.

The parties filed cross-motions for summary judgment on this issue, and the trial court granted the Remaining Owners' motion. It determined that the TAPS Agreement does not transfer to the Remaining Owners or require the Remaining

10

Owners to assume the DR&R obligations undertaken by Unocal in the right-of-way leases. The trial court subsequently granted summary judgment in favor of the Remaining Owners on the "shall pay" claim, reasoning that the issue was not ripe because the NSV of Unocal's interest in TAPS had not yet been determined. It dismissed Unocal's declaratory judgment claim on that issue for want of jurisdiction. This appeal followed.

## Standard of Review

### A.     Summary Judgment

We review the trial court's grant of a summary judgment de novo. *Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 192 (Tex. 2007); *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). To prevail on a traditional summary judgment motion, the movant bears the burden of proving that no genuine issues of material fact exist and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).

When both parties move for summary judgment on the same issues and the trial court grants one motion and denies the other, we review both parties' summary judgment evidence and determine all questions presented. *Dorsett*, 164 S.W.3d at 661; *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000). Each party bears the burden of establishing that it is entitled to

11

judgment as a matter of law. *City of Santa Fe v. Boudreaux*, 256 S.W.3d 819, 822 (Tex. App.—Houston [14th Dist.] 2008, no pet.); *see also* TEX. R. CIV. P. 166a(c) ("The judgment sought shall be rendered forthwith if . . . there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the issues expressly set out in the motion or in an answer or any other response."). If we determine that the trial court erred, we render the judgment that the trial court should have rendered. *Dorsett*, 164 S.W.3d at 661; *FM Props.*, 22 S.W.3d at 872. If the trial court's order does not specify the grounds for its summary judgment ruling, we affirm the summary judgment if any of the theories presented to the trial court and preserved for appellate review are meritorious. *See Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003).

## B.    Declaratory Judgment

Declaratory judgments rendered by summary judgment are reviewed under the same standards that govern summary judgments generally. *Hourani v. Katzen*, 305 S.W.3d 239, 248 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Under the Uniform Declaratory Judgments Act ("UDJA"), a person whose rights, status, or other legal relations are affected by a statute or contract may have a court determine any question of construction or validity arising under the statute and may obtain a declaration of his rights under that instrument. TEX. CIV. PRAC. & REM. CODE ANN. § 37.004(a) (Vernon 2015); *Guthery v. Taylor*, 112 S.W.3d 715,

720 (Tex. App.—Houston [14th Dist.] 2003, no pet.). We review declaratory judgments under the same standards used for other judgments and decrees and look to the procedure used to resolve the issue at trial to determine the appropriate appellate standard of review. *Guthery*, 112 S.W.3d at 720; *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 37.010 (Vernon 2015) ("All orders, judgments, and decrees under this chapter may be reviewed as other orders, judgments, and decrees."). Because, in this case, the trial court resolved the case on competing summary judgment motions, we review the propriety of the trial court's denial of the declaratory judgment under the same standards we apply to the summary judgments. *See Guthery*, 112 S.W.3d at 720.

## C. Contracts

We construe written contracts to give effect to the parties' intent expressed in the text of the contract "as understood in light of the facts and circumstances surrounding the contract's execution, subject to the limitations of the parol-evidence rule." *Americo Life, Inc. v. Myer*, 440 S.W.3d 18, 22 (Tex. 2014) (citing *Houston Exploration Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011)). We construe the parties' intentions as expressed in the document, considering the entire writing and attempting to harmonize and give effect to all of the contract's provisions with reference to the whole agreement. *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 311–12 (Tex. 2005).

"We construe contracts 'from a utilitarian standpoint bearing in mind the particular business activity sought to be served' and 'will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive.'" *Id.* at 312; *accord Ace Ins. Co. v. Zurich Am. Ins. Co.*, 59 S.W.3d 424, 428 (Tex. App.— Houston [1st Dist.] 2001, pet. denied). If, after the rules of construction are applied, the contract can be given a definite or certain legal meaning, it is unambiguous and we construe it as a matter of law. *Frost Nat'l Bank*, 165 S.W.3d at 312.

### Summary Judgment on Assumption of Unocal's DR&R Obligations

In its first and second issues, Unocal argues that the trial court erred in determining that the Remaining Owners were not required to assume Unocal's DR&R obligations. It argues that the trial court should have denied the Remaining Owners' motion for summary judgment on this issue and granted its own summary judgment seeking a declaration that the TAPS Agreement unambiguously requires the Remaining Owners to assume unconditionally the obligations to perform or pay for the DR&R obligations of TAPS arising from their acquisition of Unocal's undivided interest in TAPS.

Specifically, Unocal argues that section 8.3 of the TAPS Agreement expressly contemplates incorporation of the DR&R obligations from the rights-of-way agreements by providing for salvage at the termination of the TAPS

Agreement. It also argues that section 7.8 of the TAPS Agreement, which provides that "in any transfer, all obligations must transfer with the interest," applies here. The Remaining Owners argue, to the contrary, that Texas law requires that the DR&R obligations must "be located somewhere within the TAPS Agreement itself" in order to require that they assume that obligation as part of the transfer of Unocal's interest. They assert that the DR&R obligations are not part of the TAPS Agreement but were "created in separate Right-of-Way leases that are not named in the TAPS Agreement, much less 'plainly referenced' with the specificity that Texas law demands."

We conclude that the Remaining Owners' argument ignores the basic nature of the owner's interest in TAPS, as set out in section 3.1 of the TAPS Agreement and in section 13.1 of the TAPS Operating Agreement incorporated therein, and the TAPS Agreement's provisions regarding the calculation of the NSV and the allocation of salvage operations to the owners upon termination of the TAPS Agreement.

Under the terms of the TAPS Agreement, the paragraph governing the dispute between the parties here is section 8.2(e), addressing conveyance of a withdrawing owner's interest in TAPS to parties desiring to continue operations. Under Section 8.2(e), when a party desires to discontinue operations, as Unocal is seeking to do here, the parties must establish the NSV. Unocal's undivided interest

15

in TAPS cannot be transferred to the Remaining Owners until that is done and the necessary payment is made. Then, section 8.2(e) provides that Unocal, as the withdrawing party, "shall convey to the purchasing Parties all of its . . . interest in TAPS and all rights in connection therewith."

Section 3.1 of the TAPS Agreement provides that the Owners own an undivided interest in TAPS, including an interest in "all fee titles, easements, leases, permits, rights-of-way and other interests in land, required for the design, construction, operation and maintenance of TAPS," with each party's interest being equal to its percentage of ownership in TAPS. The federal right-of-way agreement containing the DR&R obligations conveys an interest in land. Thus, pursuant to section 3.1, the right-of-way is owned by the Owners in common, with each Owner's share being proportionate to its share of the entire value of TAPS as set out in Article III of the TAPS Agreement.

The rights-of-way were essential to the creation of TAPS, and the TAPS Agreement recognizes this by providing, in section 3.1, that "TAPS (including but not limited to all fee titles, easements, leases, permits, *rights-of-way and other interest in land*) shall be owned by the Parties hereto with each Party's undivided interest in TAPS . . . being equal to its percentage of ownership ("Percentage of Ownership") in TAPS as set forth [in this section]." (Emphasis added). The TAPS Agreement likewise provides that a transfer pursuant to section 8.2(e) transfers "all

16

of [the withdrawing party's] interest in TAPS and all rights in connection therewith." The property rights conveyed in the federal right-of-way cannot be separated from the accompanying obligations and must be transferred with the TAPS interest, pursuant to the TAPS Agreement's plain language.

This reading is confirmed by section 7.8 of the TAPS Agreement, which provides for the transfer of all "obligations" of the withdrawing owner as well as all rights. In addition, section 8.3 contemplates the division of salvage costs among the Owners upon termination of the TAPS Agreement unless some other agreement takes its place, necessarily implying that the Owners at the time of termination will share salvage costs pro rata. Specifically, section 8.3(d) of the TAPS Agreement provides that when the NSV of the withdrawing Owner's pro rata share in TAPS has been determined and paid, Unocal, as the withdrawing party, must "convey to the purchasing Parties all of its . . . interest in TAPS and all rights in connection therewith."

This reading is further confirmed by section 8.2 of the TAPS Agreement. Sections 8.2(d) and (e) expressly provide for the determination of the NSV of the withdrawing party's interest at the time of the party's withdrawal.[1] And they

---

[1] On rehearing, the Remaining Owners argue, in part, that construing the relevant contracts here as requiring the NSV to be calculated in light of the burden created by the DR&R obligations is erroneous and unworkable. The Remaining Owners argue that "[t]he issue regarding how the NSV should be calculated . . . is distinct from the [the issue of whether a withdrawing member's obligation may transfer to

contemplate the exchange of money based on that NSV in return for transfer to the purchasing parties of "all of [the withdrawing party's] interest in TAPS and all rights in connection therewith." The NSV of the withdrawing party's interest is the gross salvage value minus the estimated present value of the DR&R obligations. Paragraph 8.2(d) makes it clear that "all transferable interests in land" of the withdrawing owner are assessed in determining NSV; and section 13.1 of the TAPS Operating Agreement, which is incorporated in the TAPS Agreement, makes it clear that these "transferrable interests in land" include the obligations that burden the interest, namely, the DR&R obligations of the withdrawing party.

And finally, this interpretation of the TAPS Agreement and other relevant documents is confirmed by the nature of the DR&R obligations themselves. The federal right-of-way agreement and other documents, including the leases and the TAPS Agreement itself, require the TAPS owners to dismantle and remove pipeline equipment and improvements and restore the affected land once TAPS

the Remaining Owners] and is not an issue any party asked the Court to resolve or that the Court has the authority to resolve." Unocal sought a declaration that when it ceases operations and reverts its ownership to the Remaining Owners, it also transfers the DR&R obligations. In construing the TAPS Agreement and the other relevant documents to determine whether the trial court erred in refusing this declaration, this Court necessarily had to construe section 8.2 of the TAPS Agreement, including the provisions addressing the NSV. Thus, this issue was placed squarely before this Court. And, as discussed in our analysis of the ripeness of the "shall pay" provision below, the TAPS Agreement provides that determination of the *amount* of the NSV must be determined by arbitration in the event the parties cannot agree. However, the meaning of the contract's terms is a question of law properly presented to this Court.

ceases operations. The federal right-of-way specifically provides that "upon completion of use of all, or a very substantial part, of the Right-of-Way . . . Permittees shall promptly remove all improvements and equipment[.]" The federal right-of-way further provides that TAPS owners "shall restore the land to a condition that is satisfactory to the Authorized Officer [designated by the federal government to make such decisions] or at the option of Permittees pay the cost of such removal and restoration."

As these provisions make clear, the DR&R obligations cannot accrue or be performed until such a time as TAPS ceases operating, in whole or in substantial part, and the various rights-of-way or leases are no longer being used. The plain, ordinary, and generally accepted meaning of "accrue" is "to come into existence as an enforceable claim or right; to arise," or, alternatively, "to accumulate periodically." BLACK'S LAW DICTIONARY (9th ed. 2009). The obligation to dismantle the pipeline system and restore the affected land, by its nature, does not "accumulate periodically." Rather, as provided for in the federal right-of-way agreement, it can only be performed or come into existence as an enforceable claim "upon the completion of use of all, or a very substantial part, of the Right-of-Way." *See Gehan Props. II, Ltd. v. Performance Interconnect, Inc.*, No. 05-01-01678-CV, 2002 WL 1136989, at \*2 (Tex. App.—Dallas May 30, 2002, no pet.) (holding that "[b]ecause the duty to perform, i.e., to restore the leased premises to

19

their condition prior to the alterations did not arise until the lease terminated . . . , the obligation to restore the premises was clearly an obligation 'accruing' after [the sublessee] occupied the premises" even though modifications to property were made by prior lessee, when sublessee had assumed "all obligations of Tenant under the Lease accruing from the date it occupied the Premises").

Under the plain language of the federal right-of-way, no DR&R obligations were owed at the time of Unocal's election to withdraw. And neither party has presented any evidence regarding a specific date when the DR&R obligations will arise and need to be performed—nor could they. That time will not come until TAPS ceases operating at some unknown date in the future. Likewise, the exact scope and cost of the DR&R obligations cannot be determined at this time. To hold, as the Remaining Owners ask us to do, that Unocal would remain liable for the future DR&R obligations even after withdrawal would be contrary to the intent of the parties as expressed in the TAPS Agreement, which allows parties to withdraw and expressly provides that upon exchange of necessary payments, the withdrawing party "shall convey to the purchasing Parties all of its or their interest in TAPS and all rights in connection therewith" and that the conveyance "shall require the transferees to assume the obligations accruing under this Agreement subsequent to the last day of the Agreement Term during which such Party or Parties made the election to discontinue operations."

Based on this reasoning, we reject the Remaining Owners' arguments that the DR&R obligations under the right-of-way leases are in some way separable from the rest of the interest in TAPS and must be dealt with separately under the terms of the rights-of-way themselves. Nothing in the federal right-of-way contradicts the construction of the TAPS Agreement and TAPS Operating Agreement as set out above. Regarding transfers of rights and obligations under the federal right of way, the federal right-of-way agreement states only that transferring parties must obtain written consent and that transferees (like the Remaining Owners) must demonstrate their capability to perform the transferred obligations and liabilities.

The federal right-of-way agreement provides that once the details of a transfer are resolved among the involved parties, approved by the relevant government entities, and the deal is consummated,

> a permittee [like Unocal] seeking to be divested . . . of its right, title, and interest in and to the Right-of-Way and this Agreement in connection with a transfer shall be released from its liabilities and obligations (accrued, contingent, or otherwise) to the United States under this Agreement *to the extent and limit that the Transferee assumes unconditionally the performance and observance of each such liability and obligation. . . .*"

(Emphasis added.) The federal right-of-way agreement in no way prevented the parties from entering into comprehensive agreements—like the TAPS Agreement and that TAPS Operating Agreement—governing the design, construction,

ownership, operation, maintenance, and expansion of TAPS. The TAPS Agreement and the TAPS Operating Agreement set out the rights and obligations of the parties involved in transferring their undivided interest in TAPS. And the federal right-of-way agreement provides a mechanism for having that transfer recognized by the federal government.

Under this construction, an owner seeking to withdraw from the TAPS Agreement must still account for the costs associated with the DR&R obligations, as those costs are an essential consideration in determining the value of the withdrawing party's interest. We have already concluded that the DR&R obligations are obligations "accruing under this [TAPS Agreement]" pursuant to section 8.2(e). And, as Unocal argues, the DR&R obligations have not yet "accrued" in a legal sense because there is not a present and enforceable right or demand to pay them.

However, under the plain language of Section 8.2(e) of the TAPS Agreement, the conveyance of Unocal's interest in TAPS "shall require the [Remaining Owners] to assume the obligations *accruing under this Agreement subsequent to the last day of the Agreement Term* during which [Unocal] made the election to discontinue operations. . . ." (Emphasis added). The nature and scope of the DR&R obligations cannot be determined or performed until such time as TAPS operations cease and the actual dismantlement, removal, and restoration can

be completed. The Remaining Owners, as the purchasing parties of "the obligations accruing under this Agreement subsequent to" the withdrawing party's election to discontinue operations in order to effectuate the transfer of its interests in TAPS, assume the DR&R obligations going forward after the last day of the Agreement Term during which Unocal elected to discontinue operations, pursuant to sections 8.2(d) and (3) of the TAPS Agreement. But the anticipated *costs* of the DR&R obligations—costs for which Unocal has already provided an accounting and received tax benefits—affect the value of Unocal's interest in TAPS at the time of its withdrawal.

Accordingly, we hold that the trial court erred in concluding that the DR&R obligations contained in the federal right-of-way are not transferred when a withdrawing owner like Unocal withdraws from the TAPS Agreement and transfers its interest to the Remaining Owners. DR&R obligations are transferred, but the NSV due to the withdrawing party to purchase an interest thus burdened is determined by subtracting the value of the DR&R obligations at the time of the transfer from the gross salvage value of the interest transferred.

On rehearing, the Remaining Owners argue that this calculation is insufficient to protect their interests under the TAPS Agreement because "Unocal also contends that the 'shall pay' provision in section 8.2(e) means Unocal does not have to make a payment to the Remaining Owners, no matter how negative the

value of the NSV is." As discussed below, the proper construction of the "shall pay" provision has not been addressed by the parties or the courts. Accordingly, the Remaining Owners' arguments regarding the proper construction of the "shall pay" provision, in the context of the entire TAPS Agreement and related contracts, remains an open issue. But the fact that the construction of the "shall pay" provision is still unsettled does not alter our construction of a withdrawing party's rights and the remaining owners' obligations based on the express language of the TAPS Agreement. We also observe that, while the Remaining Owners elected to continue operation of TAPS upon receiving Unocal's notice of withdrawal, that is not the only option available to them under the TAPS Agreement upon the withdrawal of a particular party.

We sustain Unocal's first issue.[2]

## Ripeness of the "Shall Pay" Provision

In its fourth issue, Unocal argues that the trial court erred in concluding that the dispute over the "Shall Pay" provision is not ripe.

---

[2]     Because we sustain Unocal's argument regarding the transfer of the DR&R obligations with the transfer of its interest in TAPS, we need not address Unocal's additional argument, in the alternative that, the contract is ambiguous and the trial court erred in rendering judgment as a matter of law at the summary judgment phase. We likewise need not address Unocal's third issue in which it challenges the trial court's ruling regarding summary judgment evidence considered in its determination of the summary judgments on DR&R obligations.

Because it determined that the parties' dispute over the "shall pay" provision implicated its contractual withdrawal rights, Unocal sought a declaration from the trial court that:

> The TAPS Agreement entitles [Unocal] to receive [its] proportion of Net Salvage Value if it is determined to be positive, but does not obligate [it] to pay any proportion of Net Salvage Value to the [Remaining Owners] if it is determined to be negative.

The trial court dismissed this claim, concluding that it was not ripe for consideration because the parties had not yet submitted the issue of determining the NSV to the arbitrators as provided for under the TAPS Agreement and thus any judgment that the court rendered regarding a specific NSV value would be advisory and improper.

## A. Standard of Review

Ripeness is a component of subject matter jurisdiction and is subject to de novo review. *Robinson v. Parker*, 353 S.W.3d 753, 755 (Tex. 2011); *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex. 1998). Ripeness requires the existence of a "concrete injury"—the facts must show "'that an injury has occurred or is likely to occur, rather than being contingent or remote.'" *Robinson*, 353 S.W.3d at 755 (quoting *Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 852 (Tex. 2000)). The ripeness doctrine "focuses on whether the case involves 'uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Patterson v. Planned Parenthood*, 971 S.W.2d 439, 442

25

(Tex. 1998) (quoting 13A Wright et al., FEDERAL PRACTICE & PROCEDURE, § 3532 (2d ed. 1984)).

The requirement that a claim be justiciable or ripe applies to declaratory judgment actions. *Brooks v. Northglen Ass'n*, 141 S.W.3d 158, 163–64 (Tex. 2004). "The [UDJA] does not create or augment a trial court's subject matter jurisdiction—it is merely a procedural device for deciding cases already within a trial court's jurisdiction." *Anderton v. City of Cedar Hill*, 447 S.W.3d 84, 94 (Tex. App.—Dallas 2014, pet. denied). The purpose of a declaratory judgment claim is "to settle and afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations. . . ." TEX. CIV. PRAC. & REM. CODE ANN. § 37.002(b) (Vernon 2015); *Anderton*, 447 S.W.3d at 94. However, the UDJA "gives the court no power to pass upon hypothetical or contingent situations, or determine questions not then essential to the decision of an actual controversy, although such questions may in the future require adjudication." *Riner v. City of Hunters Creek*, 403 S.W.3d 919, 922 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (quoting *Firemen's Ins. Co. of Newark, N.J. v. Burch*, 442 S.W.2d 331, 333 (Tex. 1968), *superseded by constitutional amendment on other grounds as stated in Farmers Tex. Cty. Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81 (Tex. 1997)).

A declaratory judgment is appropriate if (1) a justiciable controversy exists as to the rights and status of the parties and (2) the controversy will be resolved by

26

the declaration sought. *Brooks*, 141 S.W.3d at 163–64; *Tex. Dept. of Public Safety v. Moore*, 985 S.W.2d 149, 153 (Tex. App.—Austin 1998, no pet.) (citing *Bonham State Bank v. Beadle*, 907 S.W.2d 465, 467 (Tex. 1995)). A justiciable controversy is one in which a real and substantial controversy exists involving a genuine conflict of tangible interest and not merely a theoretical dispute. *Moore*, 985 S.W.2d at 153. However, "[i]t is not necessary that a person who seeks a declaration of rights under [the UDJA] shall have incurred or caused damage or injury in a dispute over rights and liabilities, but it has frequently been held that an action for declaratory judgment would lie when the fact situation manifests the presence of 'ripening seeds of a controversy.'" *Id.* at 153–54 (quoting *Ainsworth v. Oil City Brass Works*, 271 S.W.2d 754, 760–61 (Tex. Civ. App.—Beaumont 1954, no writ)). Jurisdiction under the UDJA primarily depends on the nature of the controversy—whether it is merely hypothetical or rises to the justiciable level. *Id.* at 154.

**B.    Ripeness of Dispute over "Shall Pay" Provision**

As stated above, section 8.2(e) of the TAPS Agreement addresses the conveyance of a withdrawing owner's interest in TAPS to parties desiring to continue operations. It provides that when a party desires to discontinue operations, as Unocal is seeking to do here, the parties must establish the NSV to effectuate

the transfer. Unocal's undivided interest in TAPS cannot be transferred to the Remaining Owners until that is done and any necessary payment is made.

To establish the NSV, section 8.2(d) provides that the parties had sixty days after expiration of the 2012 term to agree on the NSV. Section 8.2(d) further provides that when the parties cannot agree on the NSV—as happened here—the issue of determining the NSV "shall be submitted to arbitration, using the procedure set forth in Section 11.1" of the TAPS Agreement. Under section 8.2(d), the NSV includes "transferable interests in land, material, equipment and allotment items of value."

Section 8.2(e), entitled "Conveyance to Parties Desiring to Continue Operations," provides:

> Upon establishing the Net Salvage Value as above provided, the Parties desiring to continue operations shall pay to the Party or Parties desiring to discontinue operations its or their proper proportion of such Net Salvage Value (such proper proportion being determined as to each Party desiring to discontinue operations hereunder by multiplying such Party's Percentage of Ownership times the Net Salvage Value) and upon receipt of such payment, such Party or Parties shall convey to the purchasing Parties all of its or their interest in TAPS and all rights in connection therewith.

Section 8.2(e) goes on to provide that the transferees shall "assume the obligations accruing under this Agreement subsequent to the last day of the Agreement Term during which [the withdrawing party] made the election to discontinue operations."

28

Under the plain language of the TAPS Agreement, the determination of the nature and amount of any payment depends upon the parties' first establishing the NSV. The Remaining Owners argue, and the trial court agreed, that because the operation of section 8.2(e)'s "shall pay" clause depends on the establishment of the NSV, this claim is not ripe until the NSV is determined through arbitration.

We disagree. The only question to be submitted to the arbitrators is the question of the amount of the Net Salvage Value of TAPS itself. Section 11.1 of the TAPS Agreement does not provide for arbitration to interpret the effect of section 8.2(e)'s "shall pay" provision, which is why Unocal has filed a declaratory judgment seeking the Court's interpretation of this provision. Thus, this question presents a justiciable controversy in that it seeks an answer to a real and substantial controversy involving a genuine conflict of tangible interest. *See Moore*, 985 S.W.2d at 153. Unocal has taken steps to withdraw from TAPS but has been unable to complete the process because of a real and substantial controversy between itself and the Remaining Owners regarding the construction of section 8.2(e) of the TAPS Agreement and the attendant rights and obligations of the parties. This is not merely a theoretical dispute, and Unocal's inability to complete the withdrawal process represents a concrete injury. *See Robinson*, 353 S.W.3d at 755.

Furthermore, the controversy will be resolved by the declaration sought. The court's construction of section 8.2(e) will "settle and afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations" between Unocal and Remaining Owners in light of Unocal's withdrawal from TAPS. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.002(b); *Anderton*, 447 S.W.3d at 94. A declaratory judgment construing the effect of section 8.2(e) on the parties' rights and obligations under the TAPS Agreement in light of Unocal's attempts to withdraw from TAPS provides the parties the information they need going forward in their business dealings and in the litigation.

The Remaining Owners argue that if the DR&R obligations are not included as an offset, the NSV could be positive and, thus, Unocal's issue is unripe because it might not come to pass that the arbitrators find a negative NSV. However, we have settled the question of whether the DR&R obligations are part of Unocal's entire TAPS interest that transfers pursuant to section 8.2(e). And regardless of what the arbitrators ultimately determine to be the Net Salvage Value, it is clear from the current dispute between the parties that section 8.2(e) must be construed to effectuate Unocal's withdrawal.

In fact, the parties' own arguments regarding the transfer of the DR&R obligations demonstrate the necessity of the courts' construing the terms of the TAPS Agreement regarding Unocal's withdrawal from operations independently

of any NSV found by the arbitrators. In the context of their arguments seeking to construe the transfer of the DR&R obligations, the parties bring forward competing views of when the DR&R obligations "accrue" under the TAPS Agreement. When the obligation "accrues" must be considered and determined as a matter of law by a court before the valuation of the withdrawing party's interest and obligations—interests and obligations that will be transferred to the Remaining Owners—can be completed by the arbitrators. We have now resolved that issue.

We conclude that the trial court erred in determining that this issue is not ripe for consideration. Accordingly, we reverse the trial court's judgment to the extent it dismissed Unocal's claim for declaratory judgment seeking construction of the "shall pay" provision and remand for further proceedings. *See Anderton*, 447 S.W.3d at 95, 98 (reversing portion of trial court judgment that erroneously dismissed claim on ripeness grounds and remanding for further proceedings).

We sustain Unocal's fourth issue.

## Conclusion

We conclude that the trial court erred in rendering a declaratory judgment in favor of the Remaining Owners regarding the transfer of the DR&R obligations and in concluding that the "shall pay" issue was not ripe. Accordingly, we reverse the trial court's judgment. We render judgment declaring that the DR&R obligations are part of a withdrawing owner's interest in TAPS that are transferred pursuant to section 8.2(e), and we remand Unocal's claim seeking declaratory judgment construing the "shall pay" provision for further proceedings consistent with this opinion.

Evelyn V. Keyes
Justice

Panel consists of Chief Justice Radack and Justices Keyes and Higley.